# EXHIBIT "A"

Case 1:23-cv-11209-DLC   Document 1-1   Filed 12/27/23   Page 2 of 99

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------x

THERESA SPIEGEL

Plaintiff,

- against -

ESTÉE LAUDER INC., ESTEE LAUDER COMPANIES, INC.,
ELC BEAUTY LLC, ESTEE LAUDER INTERNATIONAL INC.,
LUSINE JACOBS, NOE ARTEAGA, ANGELINA MILLER
and JENNE EUGENE.

Defendants.

-------------------------------------------------------------------x

Index No. _____

Plaintiff designates
New York County as the
place of trial.

The basis of venue is
place of occurrence.

**SUMMONS**

To the above named Defendants:

**YOU ARE HEREBY SUMMONED** to answer the Verified Complaint in this action and to serve a copy of your Verified Answer on the undersigned attorneys Tanner & Ortega, LLP, representing Plaintiff, within twenty (20) days after the service of this Summons, exclusive of the day of service (or within 30 days after the service is complete if this Summons is not personally delivered to you within the State of New York).

Please take notice that this action is based on a tort cause of action, that plaintiff seeks money damages for personal injuries and that incase of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Verified Complaint.

Dated: New York, New York
November 28, 2023

Yours, etc.,

*Hugo Ortega*
_____

Tanner & Ortega, LLP
Hugo Ortega, Esq.
*Attorneys for Plaintiff*
299 Broadway, 17th Floor
New York, N.Y. 10007

1

## **DEFENDANTS' ADDRESSES**:

ESTÉE LAUDER INC.
767 Fifth Avenue,
New York, New York 10153

ESTEE LAUDER COMPANIES, INC.
767 Fifth Avenue,
New York, New York 10153

ELC BEAUTY LLC
767 Fifth Avenue,
New York, New York 10153

ESTEE LAUDER INTERNATIONAL INC.
767 Fifth Avenue,
New York, New York 10153

LUSINE JACOBS
767 Fifth Avenue,
New York, New York 10153

NOE ARTEAGA
94 Greenwich Avenue
New York, N.Y. 10011

ANGELINA MILLER
767 Fifth Avenue,
New York, New York 10153

JENNE EUGENE
767 Fifth Avenue,
New York, New York 10153

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------------X

THERESA SPIEGEL,

                                    Plaintiff,

        —against—                                        **VERIFIED COMPLAINT**


ESTÉE LAUDER INC., ESTÉE LAUDER COMPANIES, INC.,
ELC BEAUTY LLC, ESTÉE LAUDER INTERNATIONAL INC.,
LUSINE JACOBS, NOE ARTEAGA, ANGELINA MILLER
 and JENNE EUGENE

                                    Defendant(s)

-------------------------------------------------------------------------X

Plaintiff, by her attorneys Tanner and Ortega LLC, complains of the Defendants and alleges,

upon information and belief:


## NATURE OF THE CASE

1.  This is an employment discrimination and civil rights action against Defendants,

ESTÉE LAUDER Inc., ESTÉE LAUDER COMPANIES, INC., ELC BEAUTY LLC,

ESTÉE LAUDER INTERNATIONAL INC., (hereinafter collectively ELC), LUSINE

JACOBS (hereinafter JACOBS), NOE ARTEAGA (hereinafter ARTEAGA), ANGELINA

MILLER (hereinafter MILLER) and JENNE EUGENE (hereinafter EUGENE) arising

under New York City Human Rights Law §8-107 and New York State Human Rights Law

§296(a) et seq., and *42 U.S.C. § 1981*.

2.  PLAINTIFF, a 71-year-old White, cisgender, heterosexual female, was an employee

of Defendant ELC as a Store Manager from April 2019 to November 14, 2022.

3.  At all times, PLAINTIFF's performance was satisfactory or better. Despite

PLAINTIFF's satisfactory performance, she was discriminated against on the basis of her

race, her age and her gender-identity.

1

Case 1:23-cv-11209-DLC Document 1-1 Filed 12/27/23 Page 6 of 99

## JURISDICTION AND VENUE

4.   This Court has original jurisdiction over PLAINTIFF'S claims pursuant to *New York CPLR § 301* and *§ 302*.

5.   Venue is proper in this case pursuant to *New York CPLR § 503*.

## PARTIES

6.   PLAINTIFF resides in the County of New York and State of New York.

7.   PLAINTIFF is a White, cisgender, heterosexual female who is 71 years old.

8.   That at all times hereinafter mentioned PLAINTIFF was an employee of ELC as the Manager of the Frederic Malle Editions de Parfums boutiques store, a division of ELC, in Greenwich Village, NYC.

9.   That at all times hereinafter mentioned Defendants ELC is a foreign Corporation authorized to do business in New York State, with its principal Executive Offices located at 767 Fifth Avenue, New York, New York.

10. That at all times hereinafter mentioned Defendant JACOBS was an employee of Defendant ELC, with the title of Northeast Field Executive.

11. That at all times hereinafter mentioned Defendant ARTEAGA was an employee of Defendant ELC, with the title of Fragrance Adviser at the boutique store in Greenwich Village, NYC.

12. That at all times hereinafter mentioned Defendant MILLER was an employee of Defendant ELC, with the title of Field Executive, Sales Manager.

13. That at all times hereinafter mentioned Defendant EUGENE was an employee of Defendant ELC, assigned to the Human Resources Department.

2

## **FACTUAL BACKGROUND**

14. In April 2019, PLAINTIFF was hired by Defendant ELC as the Manager of the Frederic Malle Greenwich Village, NYC store and worked in that capacity, until her termination on November 14, 2022.

15. While the Manager of the Greenwich Village store, PLAINTIFF was very successful with sales, both for the store and her personal sales.

16. In Fiscal Year 2022, from July 2021 to June 2022, under PLAINTIFF's management, the Greenwich Village store sales increased 83% over the previous year. During that same fiscal year, PLAINTIFF's personal sales were 56% of the overall total store sales, while the total sales of the other two salespeople was 44% combined.

17. This superior performance was the result of PLAINTIFF's consistent dedication and hard work, her sales skills, customer service skills, and management skills.

### *ESTÉE LAUDER EMPLOYEE REVOLT*
### *BLACK LIVES MATTER (BLM) MAKES DEMANDS OF ESTÉE LAUDER*

18. On June 2, 2020, a very large group of Estée Lauder employees wrote a letter to William Lauder, Executive Chairman of ELC (See Exhibit 1). This letter demanded that Ronald Lauder, the CEO, and a son of the ELC founders, be removed from the Company. William Lauder is the nephew of Ronald Lauder.

19. Said letter was sent while well-publicized disturbances and destructive riots by Black Lives Matter ("BLM") were taking place throughout the country as a reaction to George Floyd's death while in police custody, with allegations of systematic White violence against Blacks.

20. The basis of the letter demanding Ronald Lauder's removal as CEO, was that Mr. Lauder had donated approximately $1.7 million to Donald Trump's political campaigns over the previous few years. At that time, Donald Trump was President of the United States.

3

Case 1:23-cv-11209-DLC   Document 1-1   Filed 12/27/23   Page 8 of 99

21. The employee group found this intolerable, since they believed that President Trump was equivalent to "*state sponsored violence and racism*" against Blacks, as expressed in the letter. Ronald Lauder, as the letter goes on to say, was also accused of giving "*support of state sanctioned violence*".

22. The employee group also objected that Ronald Lauder once called former President Trump "*a man of intelligence.*"

23. Black Lives Matter ("BLM"), a militant race-based organization, greatly influenced the ensuing negotiations with ELC on the matter of Ronald Lauder.

24. Under BLM pressure, Estée Lauder offered to donate $1 million to Black charities. The employees did not accept this offer as adequate and demanded the resignation of Ronald Lauder from the company and a payment of $5 million to Black causes.

25. ELC was afraid of being branded a racist company, with adverse publicity and boycotts, and they branded Ronald Lauder a racist because he donated to Trump's campaigns.

26. Estée Lauder quickly agreed to pay $10 million to the NAACP. The Company also agreed to hire a great number of Black and other minorities and to develop many more products targeted for Blacks. ELC also agreed to purchase $25 million in supplies and services from Black-owned businesses (See Exhibits 2&3).

27. ELC also agreed to conduct mandatory training for all employees, so they would be made aware of their unconscious biases at the workplace and follow instructions as to how to eliminate those unconscious and discriminatory thoughts and actions.

28. ELC agreed to immediately establish a new department, the Equity and Engagement Center of Excellence ("COE"), to monitor and enforce the new concessions. Nicole Monson, a Black woman, was chosen to head this department.

29. ELC embraced BLM-approved causes, including LGBTQ issues (See Exhibits 4&5).

4

30. It is a well-known fact that the BLM movement is a youth and student activist-oriented movement which has always been heavily in support of the LGBTQ and other so-called liberation movements. [1]

31. The BLM Movement espouses being WOKE or awake to Social Justice causes of inclusivity and diversity but strategically seeks to impose conformity to divisive political correctness thereby encouraging the adoption of the very stifling discriminatory behavior they seek to change. [2]

32. ELC, a cosmetics and beauty products transnational corporation, cognizant of its enormous market and cultural power [3] to shape extrinsic macro-narratives around youth and gender identity [4] and profit from it, adopted and implemented BLM-driven changes by June 14, 2020, only about three weeks after the death of George Floyd, on May 25, 2020. This was only 12 days after the ELC employees wrote the demand letter to William Lauder (See Exhibit 1).

33. To the present time, BLM is involved in scandals that allege misappropriation of funds.[5]

34. BLM, as a registered non-profit organization with the IRS, does not pay any federal or state income taxes. BLM gives only about 33% of its revenues to charitable causes and therefore should not qualify as a non-profit organization. IRS regulations require a much higher use of revenue for charitable causes to benefit from this tax-exemption status. [6]

35. In the recent massacre of October 7, 2023, of a very large number of Israeli Jews and other nationals by the Hamas terrorist organization, BLM expressed support for these actions.

36. For example, on October 9, 2023, BLM Grassroots, the national organization for the Black Lives Matter movement, posted on X (formerly known as Twitter), in part, "*Black Lives Matter Grassroots stands in solidarity with our Palestinian family who are*

5

*currently resisting 57 years of settler colonialism and apartheid. As Black people continue the fight to end militarism and mass incarceration in our own communities, let us understand the resistance in Palestine as an attempt to tear down the gates of the world's largest open-air prison. As a radical Black organization grounded in abolitionist ideals, we see clear parallels between Black and Palestinian people."* [7]

37. Also, on October 10, 2023, BLM Chicago posted on X (formerly known as Twitter) an image of a Hamas terrorist paragliding into Israel, to murder Jewish men, women, and children. The BLM caption "*I STAND WITH PALESTINE*", directly supports the murder of Jews. [8]

38. It is to be noted that Ronald Lauder, the target of BLM and their associates when forcing their demands on ELC, was a very prominent world Jewish leader, as president for 16 years of the World Jewish Congress (WJC).

39. In July 2021, Defendant JACOBS became Field Executive for ELC. As such, she then became PLAINTIFF's direct Supervisor.

6

*Citation as cited above with superscripts.*

[1] https://www.forbes.com/sites/christopherrim/2020/06/04/how-student-activism-shaped-the-black-lives-matter-movement/?sh=4a4416ed4414;

See also https://news.yale.edu/2021/10/04/blm-movement-engaged-youth-positive-and-negative-effects#:~:text=While%20Black%20adolescents%20reported%20higher,such%20as%20fear%20and%20anger

See also https://www.rollingstone.com/politics/politics-features/black-lives-matter-protests-new-generation-youth-activists-1099895/

[2] https://www.aljazeera.com/opinions/2021/6/24/what-is-woke-culture-and-why-has-it-become-so-toxic

[3] https://www.elcompanies.com/en/who-we-are/key-moments#key-moments;

[4] https://www.mckinsey.com/industries/retail/our-insights/taking-a-good-look-at-the-beauty-industry; See also https://www.frontiersin.org/articles/10.3389/fpsyg.2021.623675/full

[5] https://www.cnn.com/2022/09/04/us/black-lives-matter-executive-lawsuit/index.html

[6] https://thenationaldesk.com/news/americas-news-now/blm-finances-under-fire-only-33-of-donations-given-to-charities-as-execs-paid-millions-black-lives-matter-racism-bankruptcy-deficit-fundraising-fundraisers-george-floyd-breonna-taylor-patrisse-cullors-tamir-rice-fraud-scam

[7] https://www.wdbo.com/news/black-lives-matter-group-releases-statement-solidarity-with-palestinians/RJTF6EK5WVHDVG23YYHGB4ZBYU/

[8] https://www.dailymail.co.uk/news/article-12617059/BLMs-Chicago-chapter-backs-Palestine-using-image-PARAGLIDER-like-Hamas-terrorist-flew-peace-rave-massacred-200.html

7

*DEFENDANT ARTEAGA IS HIRED BY ESTÉE LAUDER*

40. Early in September 2021, Defendant ARTEAGA applied for a salesperson position that was available at the ELC Greenwich Village store which PLAINTIFF managed.

41. Def. ARTEAGA is a Hispanic male in his early 30's, who actively identified with multiple overlapping BLM causes.

42. Def. ARTEAGA strongly identified with gender orientation and identity classifications based on the LGBTQ movement.

43. PLAINTIFF was the first Manager at ELC to interview Def. ARTEAGA for the sales position.

44. During that interview, Def. ARTEAGA stated that he needed 2 weeks off as an unpaid leave of absence (LOA) shortly after he would begin work, in December 2021 and January 2022, so he could attend his sister's wedding in California.

45. This requested LOA was mostly in a Company Blackout period, when any time off for retail staff was prohibited, due to the busy holiday season. PLAINTIFF explained to Def. ARTEAGA that this request could only be approved by her supervisors, Defs. JACOBS and MILLER. Both JACOBS and MILLER would also need to interview ARTEAGA, as part of the hiring process.

46. Accordingly, in September 2021, PLAINTIFF called Def. JACOBS, her direct supervisor, to relate the particulars of her job interview with ARTEAGA.

47. When PLAINTIFF explained ARTEAGA's request for the LOA in December and January, Def. JACOBS asked if PLAINTIFF would be able to staff the store properly with ARTEAGA being absent for 2 weeks in the Blackout period. PLAINTIFF told Def. JACOBS that she would be able to run the store properly.

48. Later in September 2021, Def. JACOBS called PLAINTIFF and told her that Def.

8

ARTEAGA had been interviewed separately by both her and MILLER, and that they approved his hiring with the LOA request granted.

49. On October 3, 2021, Def. ARTEAGA started work as a fragrance advisor (sales associate) at the Greenwich Village store, with PLAINTIFF as his manager.

50. Upon starting work, Def. ARTEAGA confirmed to PLAINTIFF that both Defs. JACOBS and MILLER had approved his request for an unpaid LOA in December 2021 and January 2022.

51. On November 10, 2021, PLAINTIFF, as required, submitted the store staffing schedule for December 2021 to Def. JACOBS for approval. This schedule reflected the previously approved LOA for Def. ARTEAGA.

52. On November 13, 2021, Def. JACOBS approved the December schedule, and PLAINTIFF then posted this schedule in the store for the staff to view.

53. On December 10, 2021, PLAINTIFF once again, as required, submitted the store staffing schedule for January 2022 to Def. JACOBS for approval. This schedule reflected the balance of the previously approved LOA for Def. ARTEAGA, in January 2022.

54. On December 13, 2021, Def. JACOBS approved the January schedule, and PLAINTIFF then posted the schedule in the store.

55. From December 19, 2021, to January 5, 2022, Def. ARTEAGA was away from the store on his Leave of Absence.

56. On December 21, 2022, while Def. ARTEAGA was on his scheduled unpaid LOA, Def. JACOBS called PLAINTIFF to ask why ARTEAGA was not working.

57. PLAINTIFF told Def. JACOBS that Def. ARTEAGA was on the LOA approved by JACOBS, and by MILLER, as a condition of ARTEAGA's hiring. Def. JACOBS claimed that she and Def. MILLER did not approve a 2-week LOA, but only a leave for "a long weekend," as she put it.

9

58. PLAINTIFF informed Def. JACOBS that Def. ARTEAGA had confirmed that the LOA had been approved by both JACOBS and MILLER for 2 weeks, and not for merely "a long weekend."

### PLAINTIFF'S FIRST WRITE-UP

59. On January 6, 2022, Defs. JACOBS and MILLER delivered a first write-up to PLAINTIFF (See Exhibit 6). A prominent part of this write-up cited PLAINTIFF for posting the December and January store staffing schedules without approval from Def. JACOBS.

60. Said write-up, written by Defs. JACOBS and MILLER, falsely accused PLAINTIFF of misconduct. However, upon information and belief, its purpose was to falsely blame PLAINTIFF for an unauthorized approval of the LOA during a Company Blackout period, so to conceal from their superiors that they, Defs. JACOBS and MILLER, were the ones who had approved the full 2-week LOA for Def. ARTEAGA.

### ARTEAGA'S CONTINUOUS COMPANY RULES VIOLATIONS

61. On or about November 2021, Def. JACOBS arrived at the store for work-related business. She observed Def. ARTEAGA working in his salesperson capacity while wearing an excessively wrinkled shirt, which was prohibited by the published *"Frederic Malle Personal Grooming Guide"* (See Exhibit 7).

62. Def. JACOBS told PLAINTIFF that this was unacceptable, and if she were the store manager, that she would send ARTEAGA home and not permit him to work in disheveled clothing.

63. Following Def. JACOBS' instruction regarding not wearing wrinkled clothing to work, PLAINTIFF instructed Def. ARTEAGA that he no longer could report to work wearing clothing that was in violation of the established dress code.

64. Def. ARTEAGA argued with PLAINTIFF and expressed the opinion that he should

10

be allowed to wait on customers wearing wrinkled clothing. He claimed that this Company policy was "*racist*," since "*it is well known that people of color like to dress like that*," as he described it to PLAINTIFF.

65. From November 2021 to May 2022, Def. ARTEAGA reported to work late on 26 separate occasions.

66. PLAINTIFF spoke with Def. ARTEAGA multiple times about his lateness. ARTEAGA was argumentative and insubordinate, and refused to alter in any manner his arrival time.

67. PLAINTIFF reported all of Def. ARTEAGA's lateness to Def. JACOBS, as required. PLAINTIFF asked permission on multiple occasions from Def. JACOBS to write up ARTEAGA for lateness. Def. JACOBS repeatedly refused to allow any write-up.

68. Finally, in May 2022, and after Def. ARTEAGA was late 26 times in a 6-month period, Def. JACOBS assented, and Def. ARTEAGA was written up by PLAINTIFF for his lateness (See Exhibit 8).

69. Yet, even after this write-up, ARTEAGA continued to come to work late.

70. In June 2022, Def. ARTEAGA was issued a 2nd write-up by PLAINTIFF over his continued lateness (See Exhibit 9).

71. Def. JACOBS explained to PLAINTIFF and Def. ARTEAGA that this 2nd warning meant that if he were late even one more time during the next 6 months, it could result in his termination.

72. Even after the final warning, Def. ARTEAGA was late on 2 more occasions.

73. When PLAINTIFF reported this to Def. JACOBS, she instructed PLAINTIFF to falsely manipulate the time record, so it would not reflect Def. ARTEAGA's continued lateness.

74. In March 2021, Def. ARTEAGA called out sick for 3 days, and was given sick pay

for these days. He told PLAINTIFF that he was very sick and needed to visit a doctor for treatment and to have medication prescribed.

75. PLAINTIFF later was informed by Giovanni Trujillo ("Trujillo"), the other salesperson at the Greenwich Village boutique, that Def. ARTEAGA was in fact not sick, but instead had traveled to Los Angeles for a social visit.

76. PLAINTIFF reported this to Defs. JACOBS and EUGENE of HR, who both told PLAINTIFF they would do nothing about ARTEAGA lying. They did not question ARTEAGA about this incident.

77. Def. ARTEAGA requested time off from work, for August 12–17, 2022. He informed PLAINTIFF that he needed to go to Los Angeles to be near his family when his infant niece would undergo a serious spinal operation at a hospital. Given the circumstances explained by Def. ARTEAGA, the time off was approved.

78. Once again, Def. ARTEAGA lied about the reason for his need for time off. PLAINTIFF discovered that Def. ARTEAGA had instead traveled to Europe for social visits and partying as shown on his social media posts.

79. In March 2022, Def. JACOBS spoke with PLAINTIFF about Def. ARTEAGA's inadequate sales figures, since he was the lowest-performing salesperson at the store. She instructed PLAINTIFF to give "*counseling and coaching*" sessions to Def. ARTEAGA to improve his sales. Prior to this, PLAINTIFF had spoken to Def. ARTEAGA about his poor sales numbers without any improvement.

80. When PLAINTIFF gave this instructed counseling session, Defendant ARTEAGA was argumentative and insubordinate to PLAINTIFF, and his sales technique did not change, nor did his sales improve.

81. Approximately one month later, in April 2022, Def. JACOBS rebuked PLAINTIFF for not causing Def. ARTEAGA's sales to improve. Def. JACOBS told PLAINTIFF that she

was not doing a good job with this, and that perhaps she should not be working for ELC.

*PLAINTIFF ORDERED TO COMPLY WITH NEW COMPANY RULES*
*ESTÉE LAUDER'S REFUSAL TO DISCIPLINE DEF. ARTEAGA*

82. On May 11, 2022, T.J. Crawford ("Crawford"), of Human Resources, called PLAINTIFF to instruct her that henceforth she was not to give compliments on personal appearance to co-workers. Before Crawford's call, PLAINTIFF had complimented Def. ARTEAGA on his haircut, he in turn complained about PLAINTIFF's compliment to HR and Def. JACOBS.

83. Human Resources, through Crawford's directive, singled out PLAINTIFF. Crawford's directive was not an established companywide rule, but was directed only to PLAINTIFF, nor was the directive given to Giovanni Trujillo.

84. On May 11, 2022, Crawford from HR called Trujillo, to inform him that Def. ARTEAGA had complained about him to HR and Def. JACOBS.

85. According to Crawford, Def. ARTEAGA had observed Trujillo waiting on a customer, and when Trujillo was asked for advice about which perfumes were popular with men, he offered some suggestions.

86. Based on the conversation between Trujillo and the customer, Def. ARTEAGA complained to HR and Def. JACOBS that this was offensive to him, since Trujillo's answer to the customer was not inclusive of men who identify with other LGBTQ categories. Crawford instructed Trujillo to keep this in mind when assisting customers in the future.

87. Once again, JACOBS' directive only singled out Trujillo and was not given by HR to any other ELC employee.

88. On June 1, 2022, PLAINTIFF received a call from JACOBS, instructing her that henceforth, she must address Def. ARTEAGA only by his name or the pronoun "their"

[sic], as JACOBS put it. JACOBS informed PLAINTIFF that employees must be addressed only by the pronouns of their choice.

89. Once again Def. JACOBS singled out PLAINTIFF, since the new pronoun rule was not given to any other employee of ELC, including Trujillo, who also worked with Def. ARTEAGA.

90. On May 28, 2022, Def. ARTEAGA once again reported to work wearing an excessively wrinkled shirt. As he had been told multiple times that this was not allowed, PLAINTIFF would not allow him to work. PLAINTIFF then immediately sent notice of Def. ARTEAGA's suspension to JACOBS and Kathryn Guarini ("Guarini") of HR.

91. On May 31, PLAINTIFF received an email from Guarini, (See Exhibit 10) stating that HR agreed with PLAINTIFF's decision, and that ARTEAGA would not be paid for the day he was sent home.

92. On June 2, 2022, Def. JACOBS called PLAINTIFF to tell her that ARTEAGA in fact would be paid for the day he was sent home by PLAINTIFF.

93. On the same call, Def. JACOBS told PLAINTIFF that Def. ARTEAGA would also be paid 3 ½ hours overtime, for telephone calls he made to JACOBS and HR that week on his day off.

94. On June 2, 2022, Def. JACOBS sent an email to all NYC employees of ELC, informing them of a new Frederic Malle Dress Code and Grooming Guideline, effective immediately (See Exhibit 11).

95. This new Guideline expressly prohibited wearing wrinkled shirts to work.

96. Yet later that same day of June 2, 2022, JACOBS sent another email (See Exhibit 12) rescinding that day's new dress and grooming code.

97. JACOBS explained in that email that she needed to check if it was applicable for North America and would get back with an update. However, JACOBS never did follow

14

up with instructions about the new dress code.

98.  On June 7, 2022, Def. ARTEAGA received a book at work that he ordered, entitled

"*How to be an Anti-Racist.*"

99.  PLAINTIFF was off work the day the book arrived. Def. ARTEAGA left the book in

a conspicuous place on PLAINTIFF's desk.

100.  The next day, when PLAINTIFF arrived at work, she immediately saw the book,

which was placed prominently on her desk by Def. ARTEAGA (See Exhibit 13). "*How to

be an Anti-racist*" has a strong, racially motivated, anti-White theme, which PLAINTIFF

found very offensive. On page 19, the author, Ibram X Kendi, writes the following:

> *"The only remedy to racist discrimination is antiracist discrimination. The
> only remedy to past discrimination is present discrimination. The only remedy
> to present discrimination is future discrimination."*

101.  In the beginning of June 2022, Def. ARTEAGA began wearing nail polish to work.

First, he wore red polish, then black polish.

102.  Wearing this color of nail polish was against the policies of the *"Frederic Malle

Personal Grooming Guide."*

103.  On June 16, 2022, PLAINTIFF sent an email to both Def. JACOBS and Guarini of

HR, (See Exhibit 14) asking for clarification from the Company regarding employees

wearing black nail polish and dressing in excessively wrinkled shirts.

104.  Neither Def. JACOBS nor HR ever responded to PLAINTIFF's email.

105.  On June 17, 2022, PLAINTIFF spoke with Def. EUGENE of HR to discuss

ARTEAGA's lateness problem and his chronic lying.

106.  Def. EUGENE told PLAINTIFF that the Company would not investigate the issue of

ARTEAGA's lying.

107.  During that same telephone call, PLAINTIFF asked EUGENE if the pronoun usage

directive was companywide. EUGENE informed PLAINTIFF that the directive was not

15

Case 1:23-cv-11209-DLC   Document 1-1   Filed 12/27/23   Page 20 of 99

companywide.

108. On July 2, 2022, written evaluations for Fiscal Year 2022, ending June 30, 2022, were presented at the store by Def. JACOBS to all boutique staff: PLAINTIFF, Trujillo, and Def. ARTEAGA.

109. For FY22, PLAINTIFF had tremendous performance success and was praised highly in her evaluation by JACOBS (see Exhibit 15). The store sales for FY22 were about $724,000, an increase over the previous year by 83%. PLAINTIFF's personal sales were $405,000, which was 56% of the total store sales. PLAINTIFF therefore made more sales than the other two salespeople combined.

110. Also in the FY22 evaluation, prepared by Defendant JACOBS, it states: "*Theresa is exemplary in providing luxurious customer experience. In FY22 she has received 18 customer complementary letters and four Google reviews. She is exemplary on planning and executing events successfully. She is exemplary on her personal productivity*".

111. For the annual evaluations of Trujillo and Def. ARTEAGA, it was scheduled so that PLAINTIFF, as store Manager, would participate in the presentation of these evaluations, together with Def. JACOBS and the individual employee.

112. For Trujillo's evaluation, this procedure was followed, so his evaluation presentation was duly attended by Def. JACOBS, Trujillo, and PLAINTIFF.

113. However, for Def. ARTEAGA's evaluation presentation, Def. JACOBS ordered PLAINTIFF instead to view a company online tutorial that addressed unconscious bias and discrimination at the workplace, and how to overcome those practices and thoughts.

114. This was the same BLM-influenced racist tutorial pushed on ELC, as a condition of the previous settlement between ELC and the group employees, as described above.

115. As a result of this abrupt change to the schedule, PLAINTIFF did not participate at all in the evaluation presentation for Def. ARTEAGA. No advance notice was given for

16

this scheduling change that caused the exclusion of PLAINTIFF in the evaluation presentation.

116. PLAINTIFF, as Def. ARTEAGA's Manager, was prevented from including her comments and evaluations about Def. ARTEAGA's performance including his insubordination, intentional disregard for company rules including his documented time and attendance problems, his refusal to conform to company rules regarding attire and nail polish use.

117. As Def. JACOBS was well aware, PLAINTIFF intended to enter into the record several negative comments about ARTEAGA's performance. Through Def. JACOBS' improper manipulations, PLAINTIFF'S comments about ARTEAGA were prevented from being noted in his employment file.

118. PLAINTIFF informed Def. JACOBS, that as Def. ARTEAGA's Manager, she needed to review his evaluation. Def. JACOBS told PLAINTIFF that she could access the evaluation through the online Company files.

119. However when PLAINTIFF later attempted to do so, she was denied access to the computer file, as she learned that she was no longer listed as Def. ARTEAGA's direct Supervisor. Instead, the computer system listed Def. JACOBS as Def. ARTEAGA's immediate Supervisor.

120. Previously, PLAINTIFF was able to access Def. ARTEAGA's personnel files, since she was his supervisor and listed as such. However, without any notification to PLAINTIFF, this had been changed.

121. PLAINTIFF spoke with Def. JACOBS regarding this issue and was told by Def. JACOBS that this listing of JACOBS as ARTEAGA's supervisor was an error. Yet Def. JACOBS never corrected the "*error*," and PLAINTIFF continued to be denied access to Def. ARTEAGA's file.

Case 1:23-cv-11209-DLC Document 1-1 Filed 12/27/23 Page 22 of 99

122. PLAINTIFF persisted in speaking to Def. JACOBS several times about this problem and demanded that she be given access to Def. ARTEAGA's personnel file, which by Company regulations she was entitled to do. Def. JACOBS repeatedly refused to allow PLAINTIFF access to the file.

123. Finally, on or about August 15, 2022, after more demands by PLAINTIFF, Def. JACOBS forwarded PLAINTIFF by email the copy of ARTEAGA's evaluation (See Exhibit 16)

124. Even then, PLAINTIFF did not have access to Def. ARTEAGA's file online, since the "*error*" of Def. JACOBS being listed as ARTEAGA's supervisor was never corrected.

### ELC FAILED TO PAY PLAINTIFF FOR WORK PERFORMED

125. During her 3 ½ years of employment with Defendant ELC, PLAINTIFF would very often arrive before her start time to perform various work tasks. However, PLAINTIFF was not permitted to clock in, even though ELC was aware that PLAINTIFF was in the store preparing to open for the day.

126. Upon information and belief, PLAINTIFF was not paid for her job performance during the times she arrived early to the store for which she would have been entitled to be paid as overtime.

### PLAINTIFF ISSUED 2ND WRITE-UP "FINAL WARNING"

127. On August 2, 2022, PLAINTIFF was issued a second write-up, (See Exhibit 17) handed to her personally by Defs. JACOBS and MILLER together.

128. The August 2, 2022 write-up was issued as a "*Final Warning,*" which meant that PLAINTIFF could be immediately terminated for any future infraction, no matter how minor.

129. Prominent in this write-up was an incident where PLAINTIFF spoke with the

18

manager of the Frederic Malle store at Madison Avenue, NYC, during which PLAINTIFF allegedly discussed problems she was having with Def. ARTEAGA.

130. Def. JACOBS called this "*overreach*," and wrote up PLAINTIFF over the incident.

131. Def. JACOBS never questioned PLAINTIFF regarding the alleged conversation, before writing her up.

132. Previous to the final warning write-up, in June 2022, Def. JACOBS verbally chastised PLAINTIFF over a coffee meeting that took place between PLAINTIFF and Frederic Malle, the founder and creative director of the Frederic Malle brand of ELC. Mr. Malle had requested that meeting.

133. At that meeting, PLAINTIFF expressed her professional opinion of Def. JACOBS, which was negative.

134. Having somehow heard of these negative comments about her, Def. JACOBS then rebuked PLAINTIFF for going to coffee with Mr. Malle, also calling it "*overreach*."

135. On August 2, 2022, when PLAINTIFF was served with the "final warning" write-up, PLAINTIFF told Defs. JACOBS and MILLER the allegations in both write-ups against her were false.

*PLAINTIFF SEEKS SEPARATION FROM ELC*

136. On September 12, 2022, PLAINTIFF, through retained counsel, notified ELC that due to the continued illegal harassment and illegal discrimination by her supervisors and the Human Resources Department, she could no longer continue to work for the Company. PLAINTIFF demanded that a satisfactory severance be paid to her, as a condition to end her employment. If the severance were not agreed to, a lawsuit would commence against ELC and individual defendants.

137. After protracted negotiations between counsel for ELC and PLAINTIFF'S counsel, a settlement could not be reached.

19

Case 1:23-cv-11209-DLC   Document 1-1   Filed 12/27/23   Page 24 of 99

138. Thereafter, Def. ARTEAGA, accused PLAINTIFF that during a private phone conversation between PLAINTIFF and a friend, Def. ARTEAGA overheard PLAINTIFF speaking negatively of him. He reported his complaint to HR.

*PLAINTIFF PLACED ON ADMINISTRATIVE LEAVE*

139. On October 25, 2022, PLAINTIFF was placed on paid administrative leave over her personal telephone call, while Defendant ELC investigated the phone call incident further. The paid leave continued until November 12, 2022.

140. As part of its "*investigation*", Def. ELC, through Def. EUGENE, wished to interview PLAINTIFF regarding the allegations made by Def. ARTEAGA.

141. PLAINTIFF informed Def. EUGENE that she would agree to be interviewed only in the presence of her attorney.

142. Def. EUGENE refused this request.

*PLAINTIFF IS TERMINATED BY ELC*

143. In retaliation for PLAINTIFF'S efforts to sever her employment relationship with ELC in an amicable manner, on November 14, 2022, Def. ELC terminated PLAINTIFF "*...due to your inability to meet company standards*" (See Exhibit 18).

### FIRST CAUSE OF ACTION FOR HOSTILE WORK ENVIRONMENT DISCRIMINATION BASED ON RACE, AGE AND GENDER ORIENTATION UNDER NEW YORK CITY HUMAN RIGHTS LAW §8-101 AND NEW YORK STATE HUMAN RIGHTS LAW §290 et Seq

144. PLAINTIFF reiterates and incorporates the allegations of paragraphs 1 through 143 above with the same effect as if set forth fully herein.

145. The standard for establishing a hostile work environment under New York City Human Rights Law and New York State HRL is essentially the same in that PLAINTIFF must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive - that is, creates an environment that a reasonable person would find

20

hostile or abusive; (2) creates an environment that the PLAINTIFF subjectively perceived as hostile or abusive; and (3) creates such an environment because of the PLAINTIFF'S protected characteristic, to wit her race, age and gender identity.

146. That PLAINTIFF here, on account of Def. ELC and its high-level supervisors including but not limited to the individually named Defendants' efforts to appease and capitalize on the racially, youth-oriented, and gender-identity motivated agenda from the radical BLM movement as detailed above, discriminated against PLAINTIFF, a White, cisgender, heterosexual 71-year-old female by singling her out by imposing upon her, rules, protocols and behavior which were not companywide, but rather specifically applied to and targeted at PLAINTIFF.

147. That Def. ELC through its high-level employees, named herein individually, in order to both maximize profits from the newly adopted BLM-inspired inclusivity protocols and to quash any potential boycotts and protests, willfully ignored the clearly documented misconduct and blatant disregard for company rules perpetrated by Def. ARTEAGA,.

148. That Def. ELC and the individually named defendants, discriminated against PLAINTIFF based on her race, gender orientation and age by failing to adhere to existing corporate rules and etiquette as required and improperly reprimanded PLAINTIFF when she attempted to correctly supervise and discipline her subordinate, Def. ARTEAGA, who is a male Hispanic, who also identified strongly with BLM and LGBTQ community causes.

149. That PLAINTIFF's actions towards Def. ARTEAGA, as described above, was a threat to Def. ELC's efforts to both appease and capitalize on BLM-influenced marketing narratives and latent threats of boycotts, protests and its social media influence, which could have had a tremendous negative financial impact on Def. ELC's profits.

150. As a result of Def. ELC's focus on corporate-driven gains stemming from increased

Case 1:23-cv-11209-DLC   Document 1-1   Filed 12/27/23   Page 26 of 99

social inclusivity, particularly targeting youth and gender identity markets, alongside concerns about potential backlash for not adopting BLM-inspired protocols, a hostile work environment emerged. This environment allowed ongoing efforts to degrade the PLAINTIFF'S role as a supervisor through humiliation and false misconduct accusations, ultimately leading her to seek legal representation to terminate her employment with Def. ELC.

151. That this pattern of patently institutionalized workplace discrimination against a very qualified White, cisgender heterosexual, 71-year-old woman, was solely due to Def. ELC's desire to maximize profits and quash any future threats from social activist movements which had previously coerced Def. ELC into donating millions of dollars to BLM-approved charities.

152. That the subsequent conduct and behavior of the named defendant supervisors set forth by PLAINTIFF in her timeline above clearly demonstrate that she both subjectively perceived a hostile work environment and that such an environment was indeed, at the outset, an objective product of reverse racial, youth-oriented and gender-identity discrimination against her as a result of her attempted supervisory actions against Def. ARTEAGA as described above. Said reverse racial, youth-oriented and gender-identity policies applied to PLAINTIFF and sustained and operationalized by the defendants over the balance of PLAINTIFF'S employment as a result of a profit-maximizing corporatist ideological obeisance to newly adopted protocols of social inclusivity resulted in invidious and unlawful discrimination of an ambitious qualified White, cisgender, heterosexual, 71-year-old woman, PLAINTIFF.

153. That the Defendants' negative references and false disciplinary write-ups against PLAINTIFF were motivated by discriminatory animus and corporate institutional bias and were otherwise retaliatory in nature as it is clear that but for Def. ELC's desire to

22

maximize profit along with fear of BLM and other groups, the Defendants would not have orchestrated the retaliatory hostile work environment that systematically denigrated and impugned PLAINTIFF's professional reputation in such a fashion as to force her to attempt to sever her employment relationship with Def. ELC.

154. That from September 2021 (when Def. ARTEAGA was hired) until PLAINTIFF'S termination on November 14, 2022, PLAINTIFF had been systematically and consistently subjected to discrimination in her employment because of her race, gender identity and age.

155. That Def. ELC, choosing profits over people, implemented newly adopted social inclusivity protocols in a haphazard and selective manner inconsistent with and against PLAINTIFF'S employment and human rights in order to further profit-making marketing advantages and limit exposure to further accusations by BLM and other groups for lack of racial inclusivity, resulting in the discrimination against PLAINTIFF as described above.

156. That the Defendants failed to implement newly adopted social inclusivity protocols in a uniform and consistent manner in conformity with applicable employment and human rights laws and thereby failed to promote the very diversity and inclusive values they had sought to implement and thus further both actively and passively encouraged reverse racial, youth-oriented and gender-identity discrimination against White, cisgender, heterosexual, aged employees and in particular PLAINTIFF, who became a victim of Def. ELC's selective and systemic discrimination, hostile work environment, harassment, retaliation, and wrongful termination, among other NYSHRL and NYCHRL violations.

157. That such discrimination caused PLAINTIFF damages in an amount in excess of the jurisdiction of every other court in which this action might be maintained.

**WHEREFORE** Plaintiff demands judgment against the Defendants for an amount in excess of the jurisdiction of every other court in which this action might be maintained.

23

## SECOND CAUSE OF ACTION

## FOR VIOLATIONS OF 42 U.S.C. §1981

158. PLAINTIFF reiterates and incorporates the allegations of paragraphs 1 through 157 above with the same effect as if set forth fully herein.

159. Each named Defendant, racially discriminated against PLAINTIFF, in violation of the rights of PLAINTIFFS and the class afforded them by the Civil Rights Act 1866, *42 U.S.C.§ 1981*, as amended by the Civil Rights Act of 1991.

160. By the conduct described above, each Defendant intentionally deprived PLAINTIFF, a White female, of the same rights as are enjoyed by Black citizens to the creation, performance, enjoyment, and all benefits and privileges, of her contractual employment relationship with Defendant ELC, in violation of *42 U.S.C. § 1981*.

161. ELC discriminated against PLAINTIFF as described above, including but not limited to privileging racially discriminating conduct against her, harassing her, subjecting her and actively enabling a hostile work environment, and wrongfully terminating her.

162. As a direct and proximate result of Defendants' unlawful racially discriminatory conduct in violation of Section 1981, PLAINTIFF has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

163. Defendants' unlawful racially discriminatory conduct constitutes a willful and wanton violation of Section 1981, was outrageous and malicious, was intended to injure PLAINTIFF, and was done with conscious disregard of PLAINTIFF's civil rights, entitling PLAINTIFF to an award of punitive damages.

24

PLAINTIFF requests the Court award her the relief prayed for below.

**WHEREFORE**, the PLAINTIFF demands judgment against each Defendant for all compensatory, emotional, psychological and punitive damages, lost compensation, front pay, back pay, liquidated damage, injunctive relief, and any other damages permitted by law pursuant to the above-referenced cause of action. It is respectfully requested that the Court grant the PLAINTIFF any other relief to which she is entitled, including but not limited to:

1. Awarding reasonable attorneys' fees and the costs and disbursements of this action;

2. Granting such other and further relief that to the Court deems just and proper.

## THIRD CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## AS AGAINST ALL DEFENDANTS

164. PLAINTIFF reiterates and incorporates the allegations of paragraphs 1 through 163 above with the same effect as if set forth fully herein.

165. In committing the acts described above, Defs. ELC, LUSINE JACOBS, NOE ARTEAGA, ANGELINA MILLER and JENNE EUGENE acted intentionally and/or recklessly in deliberate disregard of the high degree of probability of the emotional distress that PLAINTIFF would suffer.

166. The conduct of Defs. ELC, LUSINE JACOBS, NOE ARTEAGA, ANGELINA MILLER and JENNE EUGENE was so outrageous and extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

167. At all relevant times Defendants LUSINE JACOBS, NOE ARTEAGA, ANGELINA MILLER and JENNE EUGENE were employees or agents of Def. ELC, acting within the scope of their employment or agency. As such, Def. ELC, is vicariously liable for the torts committed by Defendants LUSINE JACOBS, NOE ARTEAGA, ANGELINA MILLER

25

and JENNE EUGENE under the doctrine of respondeat superior.

168.  In addition, ELC, is directly liable based on its own reckless, extreme, and outrageous conduct by allowing its employees Defs. LUSINE JACOBS, NOE ARTEAGA, ANGELINA MILLER and JENNE EUGENE to continually discriminate against PLAINTIFF based on her White race, age, and gender identity, retaliate against PLAINTIFF and harassing PLAINTIFF. Said misconduct was so shocking and outrageous that it exceeds the reasonable bounds of decency as measured by what the average member of the community would tolerate and demonstrates an utter disregard by them of the consequences that would follow.

169.  ELC knew that the foregoing reckless, extreme, and outrageous conduct by Defendants LUSINE JACOBS, NOE ARTEAGA, ANGELINA MILLER and JENNE EUGENE would inflict severe emotional and psychological distress, on others, and PLAINTIFF did in fact suffer severe emotional and psychological distress as a result, including severe mental anguish, humiliation, and emotional and physical distress.

170.  The conduct of Def. ELC, was intentional and outrageous as it pertains to the oversight, knowledge and/or acquiescence of the reverse racial, youth-oriented and gender-identity discrimination of the PLAINTIFF.

171.  As a direct and proximate result of the intentional, and outrageous actions of all Defendants, PLAINTIFF suffered and will continue to suffer physically, emotionally, and otherwise.

**WHEREFORE**, Plaintiff demand judgment against Defendants ELC, LUSINE JACOBS, NOE ARTEAGA and ANGELINA MILLER and JENNE EUGENE for damages in an amount sufficient to compensate her for her compensatory damages, for both physical and emotional pain and suffering, for punitive damage, for costs of suit, attorney fees and for such other relief as the Court finds equitable and just.

26

## FOURTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

172. PLAINTIFF reiterates and incorporates the allegations of paragraphs 1 through 171 above with the same effect as if set forth fully herein.

173. The named Defendants had a duty to promote an employment atmosphere that preserved employees' and mental safety including PLAINTIFF. By failing to follow its own rules and protocols the Defendants created a work environment where PLAINTIFF's mental and physical wellbeing was endangered.

174. In committing the acts described above, Defendants ELC, LUSINE JACOBS, NOE ARTEAGA and ANGELINA MILLER and JENNE EUGENE acted negligently and/or recklessly in deliberate disregard of the high degree of probability of the emotional distress that PLAINTIFF would suffer.

175. The conduct of Defendants ELC, LUSINE JACOBS, NOE ARTEAGA and ANGELINA MILLER and JENNE EUGENE was so outrageous and extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

176. At all relevant times Defendants LUSINE JACOBS, NOE ARTEAGA and ANGELINA MILLER and JENNE EUGENE were employees or agents of Def. ELC, acting within the scope of their employment or agency. As such, Def. ELC, is vicariously liable for the torts committed by Defendants LUSINE JACOBS, NOE ARTEAGA and ANGELINA MILLER and JENNE EUGENE under the doctrine of respondeat superior.

177. In addition, Def. ELC, is directly liable based on its own reckless, extreme, and outrageous conduct by allowing its employees Defs. LUSINE JACOBS, NOE ARTEAGA, ANGELINA MILLER and JENNE EUGENE to continually discriminate against PLAINTIFF based on her race, gender identity and age, retaliate against PLAINTIFF and harass PLAINTIFF. Said misconduct was so shocking and outrageous

27

that it exceeds the reasonable bounds of decency as measured by what the average member of the community would tolerate and demonstrates an utter disregard by them of the consequences that would follow.

178. ELC knew or should have known that the foregoing negligent, reckless, extreme, and outrageous conduct by Defendants LUSINE JACOBS, NOE ARTEAGA, ANGELINA MILLER and JENNE EUGENE would inflict severe emotional and psychological distress, including personal physical injury, on others, and PLAINTIFF did in fact suffer severe emotional and psychological distress and personal physical injury as a result, including severe mental anguish, humiliation, and emotional and physical distress.

179. ELC's conduct was intentional and outrageous as it pertains to the oversight, knowledge and/or acquiescence of the reverse racial, youth-oriented, gender-identity discrimination of PLAINTIFF at the hands of Defendants LUSINE JACOBS, NOE ARTEAGA, ANGELINA MILLER and JENNE EUGENE.

180. As a direct and proximate result of the intentional, and outrageous actions of all Defendants, PLAINTIFF suffered and will continue to suffer physically, emotionally, and otherwise.

**WHEREFORE**, Plaintiff demand judgment against Defendants ELC, LUSINE JACOBS, NOE ARTEAGA, ANGELINA MILLER and JENNE EUGENE for damages in an amount sufficient to compensate her for her compensatory damages, for both physical and emotional pain and suffering, for punitive damage, for costs of suit, attorney fees and for such other relief as the Court finds equitable and just.

**FIFTH CAUSE OF ACTION
NEGLIGENT HIRING/RETENTION AND
SUPERVISION AS AGAINST DEF. ELC**

28

Case 1:23-cv-11209-DLC   Document 1-1   Filed 12/27/23   Page 33 of 99

181. PLAINTIFF reiterates and incorporates the allegations of paragraphs 1 through 180 above with the same effect as if set forth fully herein.

182. The Defendant, ELC, was negligent, careless, and reckless in the supervision, hiring and retention of its employees, including all individually named Defendants, of hiring employees ill-equipped to perform their respective jobs without violating other employees' civil rights including PLAINTIFF's. In allowing its employees, including all the individually named Defendants to create a hostile work environment and in the negligent, careless, and reckless manner in which Def. ELC, hired, trained, supervised, controlled, managed, maintained, and retained its employees, including all the individually named Defendants, resulting in the severe and serious injury of PLAINTIFF.

183. As a direct and proximate result of the negligent, and outrageous actions of Def. ELC, PLAINTIFF suffered and will continue to suffer physically, emotionally, and otherwise.

**WHEREFORE**, Plaintiff demand judgment against Defendants ELC, LUSINE JACOBS, NOE ARTEAGA, ANGELINA MILLER and JENNE EUGENE for damages in an amount sufficient to compensate her for her compensatory damages, for both physical and emotional pain and suffering, for punitive damage, for costs of suit, attorney fees and for such other relief as the Court finds equitable and just.

### SIXTH CAUSE OF ACTION
### FOR VIOLATION OF THE FEDERAL  FAIR LABOR
### STANDARDS ACT OF 1938  (29 U.S. CODE § 206 – 2016)(FLSA),
### THE NEW YORK LABOR LAW
### (ARTICLE 19, NYLL § 650 ET AL.)(NYLL)

184. PLAINTIFF reiterates and incorporates the allegations of paragraphs 1 through 183 above with the same effect as if set forth fully herein.

185. Defendant ELC, was aware that PLAINTIFF was repeatedly, over a period of several years, arriving before her official start time at the Greenwich Village store and working, while she was not allowed to clock in. ELC knowingly, and in violation of Federal and

29

Case 1:23-cv-11209-DLC    Document 1-1    Filed 12/27/23    Page 34 of 99

State Law, refused to compensate PLAINTIFF at the overtime rate of time and a half as required by the Federal and State statutes.

**WHEREFORE**, Plaintiff demand judgment against Defendant ELC, for damages in an amount sufficient to compensate her for her compensatory damages, for both physical and emotional pain and suffering, for punitive damage, for costs of suit, attorney fees and for such other relief as the Court finds equitable and just.

## SEVENTH CAUSE OF ACTION
## RETALIATION IN VIOLATION OF 42 U.S.C. §1981

186. PLAINTIFF reiterates and incorporates the allegations of paragraphs 1 through 167 above with the same effect as if set forth fully herein.

187. ELC has violated §1981 by subjecting PLAINTIFF to retaliation for her protected complaints and opposition to the individually named Defendants' discriminatory treatment on the basis of race, age and sexual orientation, by, inter alia, terminating PLAINTIFF'S employment with the Company.

188. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of § 1981, PLAINTIFF has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

189. As a direct and proximate result of ELC's unlawful retaliatory conduct in violation of § 1981, PLAINTIFF has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

190. ELC's unlawful retaliatory conduct constitutes a willful and wanton violation of

§1981, was outrageous and malicious, was intended to injure PLAINTIFF, and was done with conscious disregard of PLAINTIFF'S civil rights, entitling PLAINTIFF to an award of punitive damages.

**WHEREFORE**, Plaintiff demand judgment against Defendant ELC, for damages in an amount sufficient to compensate her for her compensatory damages, for both physical and emotional pain and suffering, for punitive damage, for costs of suit, attorney fees and for such other relief as the Court finds equitable and just.

Dated: New York, NY
          November 28, 2023

Yours, etc.

*Hugo Ortega*

Hugo Ortega
Tanner and Ortega LLP
Attorney for plaintiff
299 Broadway – 17th Floor
New York, NY 10007

31

## VERIFICATION

STATE OF NEW YORK    }
                            }: ss

COUNTY OF NEW YORK  }

I, THERESA SPIEGEL, first being duly sworn says:

I am the PLAINTIFF in the action herein, I have read the annexed COMPLAINT, I know the contents thereof and the same are true to my knowledge, except as to the matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

*Theresa Spiegel*

THERESA SPIEGEL

Sworn to before me this **30**ᵗʰ day of November, 2023.

NOTARY SEAL:
DYLAN Q SANCHEZ
NOTARY PUBLIC
NO. 01SA6382859
My Comm. Expires
Nov 5. 2026
Qualified in Westchester County
STATE OF NEW YORK

# EXHIBIT "1"

## change.org

Petition details     Comments     Updates

# Employees of the Estee Lauder Companies demand Ronald Lauder's removal from the board

Started                     June 4, 2020
Petition to                 William Lauder and **1 other**

 **Victory**

This petition made change with 6,835 supporters!

Share this petition

## Why this petition matters

Started by **Employees of the Estee Lauder Companies**

**Thank you for taking the time to sign this petition. The list of signatures will be sent alongside a letter to William Lauder with two asks:**

**1) Removal of Ronald Lauder from the Estee Lauder Companies board**

**2) An increased donation of $5,000,000 in solidarity with the Black community, and victims of police violence**

---------

Dear Mr. William Lauder,

I am sending you this message on behalf of a collective of Estee Lauder Companies employees, and allies to the Black community. Along with this letter we have included a petition for the removal of Ronald Lauder from the board of the Estee Lauder Companies.

Thank you for participating in this morning's NOBLE Town Hall. Unfortunately, many of our questions were not answered due to limited time. Considering your vocalized support of the Black community, we feel confident and hopeful that you will respond now.

As you know, Ronald Lauder's personal investments have been made public. In 2018, Ronald Lauder made a $1.6million personal donation to the National Horizon Super PAC in support of Donald Trump. In 2017, Ronald Lauder made a $100,000 personal donation to the Trump campaign. In 2016, Ronald Lauder made a $50,000 personal donation to the National Horizon Super PAC. In 2012, Ronald Lauder made a $250,000 personal donation to the National Horizon Super PAC. Ronald Lauder joined the Estee Lauder Companies board in 2016, which means he has made personal donations of at least $1,750,000 in support of Donald Trump while working for this company.

During this morning's NOBLE Town Hall, you informed us that the Estee Lauder Companies will be making a donation of $1,000,000 in the interest of the Black community. This total does not match, or exceed Ronald Lauder's personal donations in support of state sanctioned violence.

As you consider this petition, we hope that you will also consider and answer the following

questions:

- Do you think having Ronald Lauder represent the Estee Lauder Companies in leadership and by public example, will be perceived as damaging to any statement or PR action the Estee Lauder Companies makes now in support of the Black community?

- How does Ronald Lauder's public support of Donald Trump, both financially and in calling him a "man of intelligence" on record, not imply support from the Estee Lauder Companies, or make us complicit in Donald Trump's agenda?

- Do you consider the state sponsored violence and racism at the hands of United States police related to your current motivation to declare solidarity with the Black community? If not, why?

- When deciding to protect Ronald Lauder's position on the board, did you plan to have the Estee Lauder Companies make a public statement to our consumers? If not, why?

The public believes (and your employees believe) that supporting a company by purchasing its products is akin to supporting the leadership of that company and their values.

Ronald Lauder is a visible supporter of both Donald Trump, and the Estee Lauder Companies. Ronald Lauder's involvement with the Estee Lauder Companies is damaging to our corporate values, our relationship with the Black community, our relationship with this company's Black employees, and this company's legacy.

Below are our final questions to you, Mr. Lauder:

- **Are you willing to increase the company's total donations in the interest of the safety and health of the Black community to $5,000,000? If not, why?**

- **Will you remove Ronald Lauder from the board of the Estee Lauder Companies, in an act of solidarity with the Black community and victims of police violence? If not, why?**

FILED: NEW YORK COUNTY CLERK 11/28/2023 11:01 AM
INDEX NO. 161578/2023
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 11/28/2023

Thank you for taking the time to read this, we all look forward to your response.

Best Regards,

Your Employees

⚑ Report a policy violation

# A Second Letter to William Lauder

Jun 5, 2020

Dear Mr. William Lauder,

I am writing to you again on behalf of the collective of Estee Lauder employees and allies of the Black community who have initiated a petition with two goals: Ronald Lauder's removal from the company board, and an increase in the company's planned donation towards relief for the Black community.

As I'm sure you've seen reiterated throughout today's news coverage in Bloomberg, Business Insider, Teen Vogue, Yahoo News, Business of Fashion, Dazed Digital, and Women's Wear Daily, our employee-generated petition has gained further support from Estee Lauder Companies employees.

Our consensus is made evident in over 2,000 petition signatures, an amount that will continue to grow.

As stated in our petition and in my letter to you yesterday, the public believes (and we still believe) that supporting a company by purchasing its products is akin to supporting the leadership of that company and their values.

For this reason, the corporate response published in Women's Wear Daily, *"While we respect everyone's right to make their own political decisions, no single individual represents the views of our company"*, is not acceptable to those who have signed the petition thus far.

As you continue to consider an internal response to your employees, we will continue to circulate this petition and acquire more signatures. We hope you will also answer all questions posed in yesterday's letter.

We look forward to your response.

Best regards,

Your Employees

**Updates**



# Victory

Jun 14, 2020 —

Thank you for signing this petition to engage an authentic conversation with the Estee Lauder Companies and inspire real change. ELC has released a detailed action plan for the acquisition and development of Black employees, along with other structural changes to promote equity in the company. Additionally, the company's planned donation has been significantly increased, exceeding the petition's goal: "The Estée Lauder Companies Inc., its brands and the Lauder family pledge to give, including through the Estée Lauder Companies Charitable Foundation and the company's matching of employee gifts, a total of $10 million over the next three years to support racial and social justice and to continue to support greater access to education through groups such as NAACP Legal Defense and Educational Fund, Inc., Equal Justice Initiative and The Young Women's Leadership Schools (TWYLS). We will be donating $5 million in the coming weeks and an additional $5 million over the following two years. This pledge includes and builds upon the company's $1 million pledge to support racial and social justice organizations previously communicated to our employees." Ronald Lauder will remain on the company board. In a statement to the New York Times he pledged, "As a country, we must recommit ourselves to the fight against anti-Semitism and racism. In this urgent moment of change, I am expanding the scope of my anti-Semitism campaign to include causes for racial justice, especially in the Black community, as well as other forms of dangerous ethnic and religious intolerance around the world."

# EXHIBIT "2"

# Estée Lauder Hiring More Black Employees & Suppliers



The Estée Lauder Companies has outlined its plan to boost racial equity within the U.S. organization. What's notable about the plan is not only its move to hire more Black people, but its focus on the diversity of its suppliers. The company made the announcement as Sharon Chuter's Pull Up or Shut Up campaign shook up the industry and as Lauder employees called for the resignation of Ronald Lauder.

Under the new plan, announced by William P. Lauder, executive chairman, and Fabrizio Freda, president and CEO, the company will "stand in solidarity with our Black employees, Black consumers and Black communities and firmly believe Black lives matter."

The plan comprises:

- An "intimate conversation series, town halls, one-on-one talks between leaders and employees" to foster an ongoing dialogue in the company, as well as better follow-through and acknowledgement of issues.

- Regular surveying of employees on key issues.
- Expanding unconscious bias training, including microaggressions, by making it mandatory for all full-time employees in the United States.
- POS training to better serve diverse consumers, particularly for hair care.
- Expanding the partnership with groups like its Black Employee Resource Group, as well as Allied for Justice.
- Organizing a company-wide Day of Solidarity focused on learning, action and service.
- Providing updates semi-annually on progress against its goals and KPIs to provide clarity on follow-through.
- Providing a communication platform for management and leadership performance feedback.
- Ensuring Black employees have equal access to leadership trainings and mentorship programs with senior executives and ensuring processes to account for any unconscious bias. The company will also hold management accountable for talent's growth path potential.
- Identifying Black candidates for senior-level positions.
- Reaching U.S. population parity for Black employees at all levels in the next five years.
- Requiring diverse slates of candidates for all roles at or above executive director, including internal and external candidates.
- Partnering with Black organizations (e.g., National Black MBA Association) for recruiting and doubling recruits from HBCUs, doubling diverse recruits from other top universities in the next two years and doubling the number of diverse external recruiting firms in the next year.
- Creating stronger partnerships with current and additional Black owned businesses to support recruiting.
- Tapping Black professionals to help direct product and marketing creative processes to "accurately and consistently" represent the Black experience.
- Ensuring proportionate representation of Black models in campaigns.

- Supporting a pipeline of diverse creative talent through its Creative Employee Working Group.
- Ensuring that its portfolio of makeup brands deliver products that meet the diverse shade and formula needs of the Black community.
- Pledging to give, including through The Estée Lauder Companies Charitable Foundation and the company's matching of employee gifts, a total of $10 million over the next three years to support racial and social justice and to continue to support greater access to education through groups such as NAACP Legal Defense and Educational Fund, Inc., Equal Justice Initiative and The Young Women's Leadership Schools (TWYLS). The company will be donating $5 million in the coming weeks and an additional $5 million over the following two years.

# EXHIBIT "3"



# Black Lives Matter: Estee Lauder to hire more black employees and make donations following employee concerns

[Louise Prance-Miles](#)   Jun 11, 2020



**THE WHAT?** Estée Lauder is said to have heeded employee concerns and is looking to expand its diversity agenda in the form of hiring more black employees, expanding its diversity program, and buying more from black-owned businesses, according to a report by Bloomberg.

**THE DETAILS** The beauty giant has also committed to donating $10 million to the NAACP and other racial equality organizations over the course of three years in what is a huge leap from its previous $1 million offering.

According to a company memo, top executives at Lauder said they, "stand in solidarity with our black employees, black consumers and black

communities and firmly believe black lives matter." The letter went on to list the steps the company would be taking to diversify its workforce.

Regarding current employees, the company is set to make unconscious bias training mandatory for all full-time members of staff, as well as provide more training on racial issues to managers.

In-store workers will receive training on how to interact with diverse shoppers.

**THE WHY?** The decision to increase its diversity action follows a letter from 100 employees to the company chairman, with staff calling for the resignation of heir and board member Ronald Lauder over his support of U.S. President Donald Trump.

Workers stated that his involvement with Trump has put a strain on race-relations within the company. According to federal disclosures, since re-joining the board in 2016 Lauder has donated $1.6 million to pro-Trump organizations.

# EXHIBIT "4"

ESTĒE LAUDER COMPANIES

# ELC Commits to Equality for LGBTQIA+ Community

wELCome, The Estée Lauder Companies' LGBTQIA+ Employee Resource Group, remarks on Pride Month

COMPANY FEATURE, JUN 1, 2021

June marks the official kick off to Pride Month, an important moment to celebrate LGBTQIA+ activism, community and culture. It's no secret – The Estée Lauder Companies (ELC), in partnership with wELCome, ELC's LGBTQIA+ Employee Resource Group, is a longtime supporter and advocate of LGBTQIA+ equality, and continues to strive to cultivate an inclusive, caring and compassionate workplace. 2021 marks the twelfth year that ELC has proudly been recognized as a "Best Place to Work for LGBTQ Equality" with a 100 score on the Human Rights Campaign's (HRC) 2021 Corporate Equality Index (CEI).

While the company and wELCome are set to celebrate the beauty of the LGBTQIA+ community around the world this month, we must also acknowledge all that LGBTQIA+ people are fighting for and the challenges they still face on multiple fronts.

2021 has been a record-breaking year for anti-transgender legislation in the U.S. and anti-transgender violence globally. According to a report published by the Human Rights Campaign, one of the largest LGBTQIA+ advocacy groups in the U.S., more than 100 bills have been introduced across thirty-three U.S. states – bills that are proposing to restrict the rights of transgender individuals, particularly transgender children across the country.



ELC will celebrate the Beauty of Pride internally with global and local events, offering opportunities for employees to gather virtually

At the same time, an exponential increase in visibility and positive representation of trans people in mainstream film and television, magazines, music and the business world has been noticed and celebrated. Trans people are appearing in the media as award-winning actors, writers, and advocates. This visibility gives the LGBTQIA+ community a glimmer of hope, hope that greater awareness will lead to greater safety, respect, acceptance and rights for transgender and gender non-conforming people.

On the heels of the global reset triggered by the COVID-19 pandemic, the ongoing Black Lives Matter movement, and the rise against anti-Asian hate in solidarity with the Asian American Pacific Islander (AAPI) community, allyship has been more vocal, visible and intersectional than ever. Many companies, ELC included, have expressed a clear stance on social inequities and revolutionized the way they address inclusion, diversity and equity both internally and externally.

wELCome and ELC continue to stand with their transgender and non-binary employees and their family members, consumers and partners, and denounce the rise in oppressive legislation, discrimination and violence against the LGBTQIA+ community globally. In the past year alone, local wELCome chapters have launched in the U.K., Brazil, and India, and will soon launch in Mexico, furthering the company's support and celebrating the beauty of Pride around the world. wELCome and ELC remain committed to building a workplace that is welcoming and equitable to everyone, where people from all walks of life can bring their authentic selves to work and be treated with respect and dignity.

To further build upon ELC's commitments, earlier this year wELCome developed the ELC Pride 365 Program, an internal initiative carefully designed to advocate for LBGTQIA+ equality all year beyond Pride month. As part of this program, wELCome presented a series of intersectional events to unpack firsthand accounts and reflections from LGBTQIA+ people about their lived experiences. Listening and learning from these voices proved to be a critical step to educate our employees, show support to the community and take action.



Employees celebrate at 2019 World Pride in New York City

In honor of Pride month this year, ELC and wELCome will celebrate the Beauty of Pride internally with global and local events across the world and offer opportunities to our employees to gather virtually and continue to stay resilient as a community. As we look into the future, ELC and wELCome will continue to foster challenging and meaningful conversations on how to move forward, recognize the work we still have to accomplish, and give ourselves the strength to continue – together – the fight for equality.

# You May Also Like







**PRIDE MARCHES ON**

ELC remains committed to the LGBTQA community during the time of COVID-19, launching #ELCProudTogether, a virtual Pride celebration...

READ MORE

**THE ESTÉE LAUDER COMPANIES SCORES 100 ON 2021 CORPORATE EQUALITY INDEX**

This is the twelfth year ELC has received a perfect score on the Human Rights Campaign's annual assessment of LGBTQ workplace equality

READ MORE

**SOCIAL IMPACT**

As a company, we have opportunities for meaningful engagement in social impact

READ MORE

# EXHIBIT "5"

**EVIE** DISCOVER ⌄        ABOUT        THE GLANCE        PRINT EDITION        SUBSCRIBE    |    LOGIN        🔍

**NEWS**

# Estée Lauder Is Slammed For Promoting A Transgender Person On TikTok Who Says His Favorite Part Of Being A Woman "Is Living In Full Color"



Tiktok/Shutterstock

Estée Lauder is under fire for promoting a man pretending to be a woman on its TikTok page. The hashtag #BoycottEsteeLauder has gained traction on Twitter and countless women are critical of the brand propping up the trans movement.

By Gina Florio   •   Oct 17th 2022   •   ⏱ 2 min read

 Favorite         Bookmark for later            



O ver the weekend, Ulta Beauty was heavily criticized for posting a podcast clip of a man named Dylan Mulvaney, who claimed that he "absolutely can" become a mother one day because he now identifies as a woman. He has documented his "journey of girlhood" on social media for everyone to see, and companies like Forbes and Ulta are promoting him in public in order to celebrate his appropriation of womanhood. Estée Lauder is the latest brand to fall in line with the trans propaganda. They posted a TikTok featuring a scientist who goes by Cricket Temple who works for The Estee Lauder Companies; he is a man who identifies as transgender.

# Estée Lauder Is Slammed for Promoting a Transgender Person on TikTok Who Says His Favorite Part of Being a Woman "Is Living in Full Color"

Earlier this year, Estée Lauder posted a TikTok of Cricket explaining that his "favorite part of being a woman is living in full color." Cricket is very clearly a man with long, curly hair and a breast augmentation. He's wearing a pink sleeveless shirt and has the tattoo "She Her" on his wrist.

"I lead the change by bringing to attention the things that people would rather not see," he says, "both in science and in society."

Presumably, he's implying that society isn't ready to face the so-called science that men can become women and women can become men. The comments on the TikTok are overwhelmingly positive, but as soon as Twitter picked up on the video, many women expressed their disappointment and anger over the post.



The hashtag #BoycottEsteeLauder started trending on Twitter and many women announced that they're no longer shopping the brand's products anymore. "Now @EsteeLauder, a long with @ultabeauty is parading a man around in #WomanFace, talking about what it means to be a woman. This is no better than blackface. This is a dude. They

won't define a woman, call us "birthing people", & now caricature men as women? #BoycottEsteeLauder," one woman tweeted.

**MRS. MASSACRE**
@Missus Massacre · **Follow**

Now @EsteeLauder, a long with @ultabeauty is parading a man around in #WomanFace, talking about what it means to be a woman. This is no better than blackface. This is a dude. They won't define a woman, call us "birthing people", & now caricature men as women? #BoycottEsteeLauder

8:19 AM · Oct 17, 2022

1.1K Reply Share

Read 243 replies



Estée Lauder also owns Clinique, Bumble and Bumble, Bobbi Brown, La Mer, MAC, Smashbox, and Too Faced, so if these brands haven't already jumped on the trans bandwagon, it's only a matter of time.

When Estée Lauder shared this clip of Cricket on Twitter, the responses were mostly negative. The clip only got 170 likes but it had more than 1,300 comments. Most of the responses were criticizing the audacity of a major company to suggest that womanhood can be achieved merely by a man throwing on a dress, and there were also a lot of responses in which people were simply laughing at the ridiculousness of the claim. The company tweeted a follow-up after the backlash.

"We have read some comments that are not aligned with our values. At ELC, we strive to build a community of inclusiveness, kindness, and respect for all. We are longstanding supporters of the LGBTQIA+ community today and always," they tweeted.

⊙

Not found

**View post on Twitter**

Countless women promised that they would no longer buy products from Estée Lauder. No matter how many corporations and brands attempt to promote and normalize the transgender movement, there will always be more individuals who refuse to bow down to radical gender ideology and are actually angered by the fact that it is so often shoved down their throats.

# EXHIBIT "6"

**FILED: NEW YORK COUNTY CLERK 11/28/2023 11:01 AM**   INDEX NO. 161578/2023
Case 1.23-cv-11209-DLC   Document 1-1   Filed 12/27/23   Page 65 of 99
NYSCEF DOC. NO. 8                                         RECEIVED NYSCEF: 11/28/2023

INTERNAL

## US Retail – Employee Documentation Form

**Hover over blue text for tips**

| Employee Information | | |
| --- | --- | --- |

**Employee Name**: Theresa Spiegel

**Employee ID**: 1630976

**Manager**: Lusine Jacobs

**Date**: 01/06/2022

**Job Title**: Store Manager

**Work Location**: Frederic Malle FSS -Greenwich

### Level of Documentation (select one)

☐ Written Counseling    ☒ Written Warning    ☐ Final Warning

### Type of Offense

☐ Productivity

☒ Standards of Conduct/Performance
• Violation of any applicable time-keeping policy

• Unsatisfactory job performance

**Previous Action**: Select    **Date Administered**: Click or tap to enter a date.

### Summary Details of Violation

**Work Force Management**
Part of the Store Managers primary responsibility is to close WFM (work force management) pay periods effectively and error free weekly. All punches must match the schedule posted along with all-time off requests must be coded correctly. Please refer below for inaccurate entries for the months of November and December.

- 11/27/21 w/e Theresa closed the pay period without paying employees Thanksgiving holiday. Back pay adjustment was submitted by the Field Executive.
- 12/14/21 Theresa clocked in twice in different times creating a discrepancy in the payroll which led to a problem in closing the week. Theresa has been communicated several times in the past that payroll is a legal document and discrepancies are not acceptable.
- 12/25/21 Theresa closed the WFM pay period as a floating holiday for Christmas instead of holiday pay. On 12/15/21 Theresa had received detailed instructions on how to close holiday week pay period along with 2022 holidays policy. As of 1/6/22 the correction has not been made.

It is an expectation of the store managers to build an effective store schedule. No schedules can be posted in WFM without an approval. All adjustments after the schedule is approved and posted needs to be re-approved by the field executive. Store Managers are not to approve their own personal request.
- Theresa has posted the December and the January schedules without an approval. 12/15/21 Theresa was reminded to make the appropriate corrections to the schedule for an approved and was instructed not to post without an approval.

It is an expectation of all employees to follow the companies time off request and block out guidelines. It is expected of all store managers to effectively communicate any unique scheduling request. This request must be approved by the Field Executive and HR prior to committing and posting on the schedule.
- On the December schedule Theresa approved 2 weeks (12/20/21-01/-6/22) of unpaid vacation to Noe Arteaga during holiday blackout dates. Since this was requested during blackout dates it should have been reviewed with FE prior to approval and pacing on schedule.

**Recommendation**:
Theresa should review all previous training recordings that the field executive has provided her with along with attending the WFM System overview training that she has been scheduled on 1/12. Additionally, to attend all additional trainings assigned to her to improve in the areas where she requires additional support:
1. MS Teams on 1/5/22 11AM-12:30PM from 11AM-12:30PM
2. Excel Basic Formulas/Functions on 1/5/22 from 1:00PM-2:30PM
3. Excel Managing Worksheets on 1/11/22 from 11:30AM-1:00PM
It is an expectation of the store managers to build an effective store schedule by the 10th of each month. This allows for approval and delivery of the schedule for the employees by the 15th of each month.

### Productivity Details

**Double click on table to enter information**



Case 1:23-cv-11209-DLC   Document 1-1   Filed 12/27/23   Page 66 of 99

# EXHIBIT "7"

Case 1.23-cv-11209-DLC   Document 1-1   Filed 12/27/23   Page 67 of 99

INTERNAL

## EDITIONS DE PARFUMS
## FREDERIC MALLE

### PERSONAL & GROOMING GUIDELINES

All of Editions de Parfums Frédéric Malle boutiques welcome their clients to offer them a unique experience: finding their signature scent. A very personal approach that aims at matching the right perfume with the right person. Such an experience should be luxurious and elegant in any circumstance. Editions de Parfums Frédéric Malle is a luxury French House.
Your personal appearance should reflect the style of Editions de Parfums, perfectly combining your personality with the timeless style and high standards of the Brand.

We thank you in advance for paying attention to your appearance, and respecting EDPFM personal and grooming guidelines.

**Keep in mind that it only takes a few seconds to make a first impression.**

STANDARDS & EXPECTATIONS:
- Arrive at the point of sale with impeccable clothing.
- Your attire must be clean, ironed and in relatively new condition.
- Your hair, make-up and grooming must be impeccable and reflect the Brand's standards.
- Managers have the right and the duty to ask you to change, clean, iron or repair any clothing, and adjust your presentation if needed.
- Should you doubt that the selection of accessories you want to wear is compliant with the Brand standards, ask your Manager before wearing them.
- All Brand personal and grooming standards must be respected during working hours at the point of sales, as well as during events.

CLOTHING:
- Your attire must be composed with care, present a consistent look and be aligned with the Brand spirit and aesthetics.
- Colours, textures and styles must match well and look elegant.
- Neutral, plain colours, and discrete patterns are preferred.
- Cotton or wool vs synthetic fabrics like nylon or polyester is preferred.
- Obvious brand names or logos are not permitted.
- For Department Stores, compose an attire that respects both retailer and Brand standard.
- Jeans or "sportswear" clothing are not permitted. No shorts nor Bermuda shorts.
- Should you doubt the selection of your attire, ask your Manager before wearing it to counter.

**For women:**
- Sales associates may opt for dresses or trousers or skirts.
- Dresses and skirts must be of reasonable length (no miniskirts).
- Armpits should not be visible (no tank tops). Should you wish to wear clothing without sleeves (dress or top), it has to be worn with a cardigan or a jacket.

**For men:**
- Please wear a leather belt, preferably matching shoe color.
- Smart shirts are compulsory. No t-shirts or jersey fabrics.
- A tie is optional.

Case 1.23-cv-11209-DLC   Document 1-1   Filed 12/27/23   Page 68 of 99
INTERNAL

SHOES:
- Shoes must be clean, polished and in good condition.
- Shoes must be black (or brown for men). No visible brands nor logos or accessories.
- Shoes must be entirely closed. No open heels or toes.
- Shoes can be flat or with a heel. Heel height must be reasonable.
- Boots are not allowed with skirts and dresses. Boots can be worn with trousers.
- Shoes must be worn with dark socks (for men), nude or black tights (for women- except in case of hot weather).
- Sneakers are not allowed.

ACCESSORIES:
- Jewelry should be simple and discrete.
- Colored or large extreme pieces are not allowed, preference is neutral metals.
- Earrings must be discrete, one per ear.
- Necklaces must be discrete and not show above tee shirt line (no chocker styles/ no long or maxi necklaces).
- Hair accessories must be simple and discrete: hair bands to match hair color to blend.
- Obvious combs and pins are not permitted (Black, silver/gold or nude accessories only).
- Hats, scarfs and other accessories are not allowed on point of sale, except for religious reason.

HAIR & BEARD :
- Hair must be clean, well groomed and off the face. Dirty or messy hair is not acceptable.
- Classic hair styles only (classic blow-dry, ponytail, bun…)
- Hair coloring must look natural and complement the individual (no shiny, fancy or unnatural tones- pink, blue…)
- Long hair should be styled off the face or back in style of a chic ponytail, bun etc.
- Styling products must be used sparingly.
- Beards and mustaches are allowed if perfectly trimmed and groomed. Moustaches should not grow more than mouth corners. No long beards.

MAKE UP :
- Makeup should be applied in good taste so that the colors blend naturally to the skin tone and enhance natural features.
- It should remain impeccable all day.
- Eye make-up should be discrete. Mascara and eye shadows should be conservative in color and complement the individual. No bright eye shadows or eye liners.
- Complexion must be even, fresh and natural in appearance.
- Lips must be enhanced with lipstick or a natural/nude lip gloss. Dark colors or unnatural colors are prohibited.
- No visible tattoos. If they are, they must be covered with clothing or a plaster.

NAILS
- Nails must be short, clean and manicured, for women and men.
- Nude, light-colored nail polish or French manicures are preferred.
- Nail art, bright or shiny colors on nails are prohibited.

INTERNAL

## HYGIENE

- Your hygiene must be impeccable at all times, clean appearance and fresh breathe are a necessity.
- Cigarette, food or perspiration smells will not be tolerated.

## PERFUME

- Sales associates should only wear Edition de Parfums Frédéric Malle perfumes.

Sales Associate signature                          Manager signature

# EXHIBIT "8"

INTERNAL

## US Retail – Attendance Form

**Hover over blue text for tips**

### Employee Information

| | |
|---|---|
| **Employee Name:** Enter Name: Noe Arteaga | **Date:** 05/18/2022 |
| **Employee ID:** Enter # 1672458 | **Job Title:** Beauty Advisor |
| **Manager:** Enter Name : Theresa Spiegel | **Work Location:** EDPFM FSS West Village |

### Level of Documentation (select one)

☒ Written Counseling          ☐ Written Warning          ☐ Final Warning

**Previous Action:**   Select          **Date Administered:** May 18,2022

**Verbal counseling on Time and Attendance**
**11.10.21,12.10.21, 3.28.22,4.08.22**
Click or tap to enter a date.

### Time and Attendance Details

| Date | Type | Points |
|---|---|---|
| 11/24/21 | Tardy | 0.5 |
| 11/27/21 | Tardy | 0.5 |
| 12/8/21 | Tardy | 0.5 |
| 12/9/21 | Tardy | 0.5 |
| 12/10/21 | Tardy | 0.5 |
| 12/15/21 | Tardy | 0.5 |
| 1/20/22 | Tardy | 0.5 |
| 1/20/22 | Tardy | 0.5 |
| 3/3/22 | Tardy | 0.5 |
| 3/28/22 | Tardy | 0.5 |
| 3/31/22 | Tardy | 0.5 |
| 4/2/22 | Tardy | 0.5 |
| 4/5/22 | Tardy | 0.5 |
| 4/8/22 | Tardy | 0.5 |
| 4/12/22 | Tardy | 0.5 |
| 4/14/22 | Tardy | 0.5 |
| 4/15/22 | Tardy | 0.5 |
| 4/19/22 | Tardy | 0.5 |
| 4/21/22 | Tardy | 0.5 |
| 5/3/22 | Tardy | 0.5 |
| 5/7/22 | Tardy | 0.5 |
| 5/11/22 | Tardy | 0.5 |
| 5/16/22 | Tardy | 0.5 |
| 5/17/22 | Tardy | 0.5 |
| **Total Points within the past 6 months:** | | **12** |

| Key | |
|---|---|
| Type | Points |
| Tardy | 0.5 |
| Leave Early | 0.5 |
| Sick | 0 |
| Call Out | 1 |
| NCNS | 6 |

| Key | |
|---|---|
| > 2 pts. | Verbal Coaching |
| 2-3.5 pts. | Written |
| 4-5.5 pts. | Written Warning |
| 6-7.5 pts. | Final Warning |
| 8 + pts. | Separation Review |

**Double click on table to enter information**

### Acknowledgement of Receipt of Document

By signing this form, you confirm that you understand the information in this documentation. You also confirm that you and your manager have discussed the document. Your attendance points run on a six (6) month rolling period. The rolling calendar year begins on the date of the 1st occurrence. Written Counseling and all Warnings will stay in effect as long as your accrued attendance points are in the range for each documentation level. Please note that if you are issued a Final Warning, you will be subject to additional restrictions in accordance with your brand's practices for up to 6 months from the date the Final Warning is issued. Signing this form does not necessarily indicate that you agree with this document. Failure to demonstrate the needed improvement may result in further disciplinary action up to and including termination.

_____

**Employee Signature & Date**

_Theresa Spiegel 5.21.22_

**Manager Signature & Date**

NORTH AMERICA | ESTÉE LAUDER COMPANIES

# EXHIBIT "9"

## US Retail – Attendance Form

**\*\*Hover over blue text for tips\*\***

### Employee Information

**Employee Name**: Enter Name: Noe Arteaga    **Date**: 06/16/2022

**Employee ID**: Enter # 1672458    **Job Title**: Beauty Advisor

**Manager**: Enter Name : Theresa Spiegel    **Work Location**: EDPFM FSS West Village

### Level of Documentation (select one)

☐ Written Counseling    ☒ Written Warning    ☐ Final Warning

**Previous Action**: Select      **Date Administered**: 06/19/2022

### Time and Attendance Details

| Date | Type | Points |
|------|------|--------|
| 12/15/21 | Tardy | 0.5 |
| 1/20/22 | Tardy | 0.5 |
| 1/20/22 | Tardy | 0.5 |
| 3/3/22 | Tardy | 0.5 |
| 3/28/22 | Tardy | 0.5 |
| 3/31/22 | Tardy | 0.5 |
| 4/2/22 | Tardy | 0.5 |
| 4/5/22 | Tardy | 0.5 |
| 4/8/22 | Tardy | 0.5 |
| 4/14/22 | Tardy | 0.5 |
| 4/15/22 | Tardy | 0.5 |
| 4/19/22 | Tardy | 0.5 |
| 4/21/22 | Tardy | 0.5 |
| 5/3/22 | Tardy | 0.5 |
| 5/7/22 | Tardy | 0.5 |
| 5/11/22 | Tardy | 0.5 |
| 5/16/22 | Tardy | 0.5 |
| 5/17/22 | Tardy | 0.5 |
| 5/18/22 | Tardy | 0.5 |
| 6/9/22 | Tardy | 0.5 |
| 6/15/22 | Tardy | 0.5 |
| | | |
| | | |
| **Total Points within the past 6 months:** | | 10.5 |

| Key | |
|-----|---|
| Type | Points |
| Tardy | 0.5 |
| Leave Early | 0.5 |
| Sick | 0 |
| Call Out | 1 |
| NC/NS | 6 |

| Key | |
|-----|---|
| > 2 pts. | Verbal Coaching |
| 2-3.5 pts. | Written |
| 4-5.5 pts. | Written Warning |
| 6-7.5 pts. | Final Warning |
| 8 + pts. | Separation Review |

**\*\*Double click on table to enter information\*\***

### Acknowledgement of Receipt of Document

By signing this form, you confirm that you understand the information in this documentation. You also confirm that you and your manager have discussed the document. Your attendance points run on a six (6) month rolling period. The rolling calendar year begins on the date of the 1st occurrence. Written Counseling and all Warnings will stay in effect as long as your accrued attendance points are in the range for each documentation level. Please note that if you are issued a Final Warning, you will be subject to additional restrictions in accordance with your brand's practices for up to 6 months from the date the Final Warning is issued. Signing this form does not necessarily indicate that you agree with this document. Failure to demonstrate the needed improvement may result in further disciplinary action up to and including termination.

**Employee Signature & Date**



INTERNAL

## US Retail – Attendance Form

_____

**Manager Signature & Date**



# EXHIBIT "10"

Michael Spiegel <michaelspiegel1726@gmail.com>

---

**Fwd:**

1 message

---

**Spiegel, Theresa** <tspiegel@fredericmalle.com>
To: Michael Spiegel <michaelspiegel1726@gmail.com>

Tue, Jun 28, 2022 at 8:56 AM

---

Sent from my iPhone

Begin forwarded message:

> **From:** "Spiegel, Theresa" <tspiegel@fredericmalle.com>
> **Date:** 25 June 2022 at 6:00:47 AM GMT-4
> **To:** "Spiegel, Theresa" <tspiegel@fredericmalle.com>

---

**From:** Guarini, Kathryn <kguarini@estee.com>
**Date:** Tuesday, May 31, 2022 at 9:30 PM
**To:** Spiegel, Theresa <tspiegel@fredericmalle.com>, Crawford, TJ
<tcrawfor@estee.com>, Jacobs, Lusine <lusine.jacobs@bykilian.com>
**Subject:** RE: Incident Report from 5.28.22

Hi Tess,
I hope someone was able to answer your question about payroll.
Noe should not be paid for the shift we sent him home.
Kate

**Kathryn E. Guarini**
The Estee Lauder Companies
Human Resources Manager - Retail & Field – East Region, North America
P: (646) 613-6538 | M: (216) 385-6129 | kguarini@estee.com
For immediate assistance with general HR inquiries please contact OneSource by phone at 1.844.472.8352 or CLICK
HERE to access the OneSource Portal

# ABC

Tess Spiegel
Boutique Director
94 Greenwich Avenue
New York, NY 10011
646.666.0330

# EXHIBIT "11"

INDEX NO. 161578/2023
RECEIVED NYSCEF: 11/28/2023



INDEX NO. 161578/2023
RECEIVED NYSCEF: 11/28/2023

FILED: NEW YORK COUNTY CLERK 11/28/2023 11:01 AM
NYSCEF DOC. NO. 13

INTERNAL

# EDITIONS DE PARFUMS FREDERIC MALLE

*Female dress guidelines*




**YES**



**NO**

### CLOTHES

Business ensemble of monochrome, or a mix of seasonal colors.
Always right is black, navy, and white or alternatively, an ensemble of beige, gray and whites for spring and summer.
- Each piece should be clean and pressed, have a professional cut and free of busy patterns and designer emblems.
- **The style: forward and professional: simple, polished, chic silhouettes, with high quality cloth.**

### SHOES AND ACCESSORIES

Cleaned and polished leather shoes, ankle boots, heels should be well maintained.
- Tasteful accessories that are not branded.
- No designer emblems on clothes, belts, shoes.

### FACE AND HANDS

Make-up should be worn in a natural, classic and fresh style.
- Classic red lipstick or neutral is acceptable. Clean, well-manicured nails in a shade of red or neutral skin tone.

### HAIR

Well groomed, nicely styled in a neat, classic style.
- Discreet hair pins and elastic hair bands are allowed for pulling hair up or back in a classic bun, chignon, or ponytail.
- If hair is worn pulled back butterfly clips and scrunchies are not allowed.

### DON'T

No heavy evening sparkly make up looks or nail art.
- No sneakers.
- Jeans and t-shirts.

FILED: NEW YORK COUNTY CLERK 11/28/2023 11:01 AM
NYSCEF DOC. NO. 13

INDEX NO. 161578/2023
RECEIVED NYSCEF: 11/28/2023

INTERNAL

# EDITIONS DE PARFUMS FREDERIC MALLE

*Male dress guidelines*

**YES**




**NO**




## DRESS CODE

A cleaned and pressed dark blue, black or gray suit and a white button-down shirt with collar.

- The shirt is be worn tucked into pants.
- Black or navy belt without a designer logo. A tie is optional.
- Each piece should be clean and pressed, have a professional cut and free of busy patterns and designer emblems.
- **The style: forward and professional: simple, polished, chic silhouettes, with high quality cloth.**

## SHOES AND ACCESSORIES

- Black, brown, neutral leather shoes,
- No designer emblems on belts, shoes, jewelry.

## FACE, HANDS AND HAIR

- Skin should appear natural and healthy. Fingernails should be clean, cut to a conservative length.
- Hair should be well groomed and neatly styled.

## DON'T

- No sneakers, necklaces outside a shirt, or an untucked shirt.
- Jeans and t-shirts

# EXHIBIT "12"

## Re: Frédéric Malle dress code guidelines

Jacobs, Lusine.jacobs@bykilian.com>

Thu 6/2/2022 7:30 PM

To: Mujaj, Blerta <bmujaj@fredericmalle.com>;Perez, Gilda <gilda@fredericmalle.com>;Mayhew, Joshua <jmayhew@fredericmalle.com>;Spiegel,
Theresa <tspiegel@fredericmalle.com>;Trujillo, Giovanni <giovanni@fredericmalle.com>;Trujillo, Giovanni (Frederic Malle)
<gtrujillo@fredericmalle.com>;Arteaga, Noe (Frederic Malle) <narteaga@fredericmalle.com>

Cc: Guarini, Kathryn <kguarini@estee.com>;Jackson, Jenne <jejackso@estee.com>;Miller, Angelina <anmiller@estee.com>

📎 1 attachments (598 KB)

Dress guidelines_2022.pdf;

Hello Team,

Wanted to re-circle back on the guidelines and let you know to hold off as we just want to ensure that this is applicable to North America.

Thank you

Best,

Lusine Jacobs
Northeast Field Executive | Tom Ford | By Kilian | Frédéric Malle | (C) 347-668-8219
Lusine.jacobs@bykilian.com
WWW.TOMFORD.COM
WWW.BYKILIAN.COM
WWW.FREDERICMALLE.COM
TOMFORDBEAUTY  *Kilian*  EDITIONS DE PARFUMS FREDERIC MALLE

---

**From:** Jacobs, Lusine <lusine.jacobs@bykilian.com>
**Date:** Thursday, June 2, 2022 at 12:32 PM
**To:** Mujaj, Blerta <bmujaj@fredericmalle.com>, Perez, Gilda <gilda@fredericmalle.com>, Mayhew, Joshua <jmayhew@fredericmalle.com>,
Spiegel, Theresa <tspiegel@fredericmalle.com>, Trujillo, Giovanni <giovanni@fredericmalle.com>, Trujillo, Giovanni (Frederic Malle)
<gtrujillo@fredericmalle.com>, Arteaga, Noe (Frederic Malle) <narteaga@fredericmalle.com>
**Cc:** Guarini, Kathryn <kguarini@estee.com>, Jackson, Jenne <jejackso@estee.com>, Miller, Angelina <anmiller@estee.com>
**Subject:** Frédéric Malle dress code guidelines

# EXHIBIT "13"



U.S.A. $27.00
CANADA $36.00

From the National Book Award–winning author of *Stamped from the Beginning* comes a bracingly original approach to understanding and uprooting racism and inequality in our society—and in ourselves.

## "THE ONLY WAY TO UNDO RACISM IS TO CONSISTENTLY IDENTIFY AND DESCRIBE IT— AND THEN DISMANTLE IT."

Antiracism is a transformative concept that reorients and reenergizes the conversation about racism—and, even more fundamentally, points us toward liberating new ways of thinking about ourselves and each other. At its core, racism is a powerful system that creates false hierarchies of human value; its warped logic extends beyond race, from the way we regard people of different ethnicities or skin colors to the way we treat people of different sexes, gender identities, and body types. Racism intersects with class and culture and geography and even changes the way we see and value ourselves. In *How to Be an Antiracist,* Kendi takes readers through a widening circle of antiracist ideas—from the most basic concepts to visionary possibilities—that will help readers see all forms of racism clearly, understand their poisonous consequences, and work to oppose them in our systems and in ourselves.

Kendi weaves an electrifying combination of ethics, history, law, and science with his own personal story of awakening to antiracism. This is an essential work for anyone who wants to go beyond the awareness of racism to the next step: contributing to the formation of a just and equitable society.

# EXHIBIT "14"

Michael Spiegel <michaelspiegel1726@gmail.com>

M Gmail

---

**(no subject)**
1 message

**Spiegel, Theresa** <tspiegel@fredericmalle.com>                    Thu, Jun 16, 2022 at 5:23 PM
To: Michael Spiegel <michaelspiegel1726@gmail.com>

Good morning Kate,

I hope you had a nice weekend.  I am writing to understand what the company policy is for nail grooming at ELC.

Last week Noe was wearing black nail polish.  Is this permissable?
Please advise.

Also,  Noe came to work last week with a very wrinkled shirt, as he had done on Memorial Day.
Please advise what the company policy is on approprite work attire when on duty.


Kind regards,
Tess



Tess Spiegel
Boutique Director
94 Greenwich Avenue
New York, NY 10011
646.666.0330

THIS E-MAIL IS INTENDED ONLY FOR THE ADDRESSEE(S) AND MAY CONTAIN CONFIDENTIAL INFORMATION. IF
YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY USE OF THIS INFORMATION OR
DISSEMINATION, DISTRIBUTION OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED
THIS E-MAIL IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY BY RETURN E-MAIL AND DELETE THE
ORIGINAL MESSAGE. THANK YOU.

# EXHIBIT "15"

Case 1:23-cv-11209-DLC   Document 1-1   Filed 12/27/23   Page 89 of 99

**Team Member Annual Performance Review** | **Fiscal Year:**

| Employee # | 1630976 | Date of Review | |
|---|---|---|---|
| Name | Theresa Spiegel | Location | EDPFM WV FSS |
| Position | Store Manager | | |

NORTH ESTÉE LAUDER AMERICA

## Employee Career Aspirations

Tess has created a consistent business that has thrived and benefitted from a great client outreach and monthly event implementation. Tess hopes to further help her team grow their KPI's in relation to their service.

Supervisor sets benchmark for goals. Employee collaboratively set, review goals

Review goals include sales goals, clienteling, leadership and KPIs by Brand

During visits, you discuss progress against the goals

If achieving ALL the goals set, you will receive a successful rating for the month

Year-End review rating is an aggregate of monthly ratings

## Manager Year-End Comments

Theresa has been an incredibly valuable asset when it comes to growing the Frederic Malle West Village freestanding store business. She has managed to cultivate a thriving business and has been exceeding goals. She has created a great eventing space for existing clients and for corporate/ Global events.

### SALES

Theresa have successfully executed the FY22 sales plan. The store as of April months end is at $569.5K vs Plan of $336K +69% and FYTD actual $598.6K vs FYTD plan of $404K +148% to total FY22 Plan. The store is on trend to do $724K vs Plan of $404K +179% overachieving plan by $320K with an AUS $182 AND AN IPT of 1.5

Theresa personally has contributed $320.7K 56% to the overall store business with an AUS of $195 and IPT of 1.6 overachieving the Boutiques KPI metrics
- Creating in-store event calendars and monthly focuses for the team to follow
- Creating in-store events and mini animations
- Creating a great referral program which led to better traffic at the store and generated $23K

### TEAM MANAGEMENT -COACHING AND DEVELOPING

Theresa has been great at following the boutiques image guidelines, visual merchandising, clientelling and eventing. Theresa does an incredible job on the online
- Theresa continually has a weekly team meeting where every team member gets the opportunity to highlight their weekly successes and challenges
- Reviewing missed opportunities daily to work together as a team on correcting and improving.
- Sharing the stores updated visual merchandising guidelines and ensuring that the store always looks the part.
- Coaching and developing the team based on their individualized Service sales metrics to be aligned and or overachieve the stores overall performance
- Celebrates the team on their successes and achievements on a daily basis and communicates opportunities.

### COMMUNICATION

Theresa has been communicated multiple times that it is expected of her to submit all admin requests accurately and or with minimum errors in a timely manner. Such as schedules/ revenue calendars and team DBR 's. She must have managed a team on their time in attendance and communicate if corrective actions are to be taken in a timely manner. Theresa is an effective communicator when it comes to Sharing customer feedback. She is always ready to discuss her team and business in full details during our weekly touch bases.

Updated: 10/29/2019

FILED: NEW YORK COUNTY CLERK 11/28/2023 11:01 AM

NYSCEF DOC. NO. 17

INDEX NO. 161578/2023

RECEIVED NYSCEF: 11/28/2023

INTERNAL

## EVENTING

Theresa consistently delivers when it comes to the Frederic Malle principles. She thoroughly embodies the Frederic Malle brand and is fully versed in the philosophy/selling ceremony. in FY22 the store executed 10 events generating $ 98K vs Goal of $40.3 K +... % to Goal along with weekly in-store focuses and mini animations.

- She has created a boutique geared towards events.
- She has a reliable and consistent appointment booking that has ensured a lucrative volume that is dependable.
- Theresa is supporting brand.com on virtual Frederic Malle fragrance Matchmaking consultations daily with outstanding results (30-40 consultations a month)
- Theresa is very thorough on coaching and developing the team on their knowledge of the brands philosophy / brand identity.
- Affectively coaches the team and role-plays with them to improve team on the selling ceremony as it relates to matchmaking
- Client capture rate /clienteling is a top priority in the store.

## SUCCESSES

Theresa is exemplary in providing luxurious customer experience. In FY22 she has received 18 customer complementary letters and four Google reviews. She is exemplary on planning and executing events successfully. She Is exemplary on her personal productivity.

In FY23 I would like to see Theresa focus more on coaching and developing her team becoming as proficient as she in the brand identity, in the welcoming, the recommendating, the pace of the conversation and in the closing ceremony. Linking all of these elements together will positively reflect the team's overall performance. I would like to see Theresa dedicate time each day to just observe the teams interactions with clients and effectively celebrate and coach them in a moment. I would like to see Theresa coach and develop her team on the Frederic Malle virtual consultations as she is incredible at it. I would like to see Theresa communicate effectively and submit work in a timely manner with complete accuracy and or with minimum error.

**Employee Year- End Comments**

Updated: 10/29/2019

NORTH AMERICA
ESTÉE LAUDER

FILED: NEW YORK COUNTY CLERK 11/28/2023 11:01 AM
NYSCEF DOC. NO. 17

INDEX NO. 161578/2023

RECEIVED NYSCEF: 11/28/2023

INTERNAL

| Rating | Rating Category | # | Rating Summary |
|---|---|---|---|
| | Needs significant improvement | 1 | Contributions were inconsistent. Did not leverage HPLC. |
| | Makes a contribution | 2 | Achieved partial results, displayed inconsistent performance and required regular assistance. Leveraged some HPLC. |
| | Successful | 3 | Achieved results and key business goals. Sometimes exceeded job requirements and leveraged HPLC. |
| | Exemplary | 4 | Exceeded key business goals and often exceeded job requirements. Often achieved high performance and demonstrated HPLC. |

**\*\*Please record monthly ratings below. The Mid-Year (MY) Rating should be a cumulative rating YTD**

**Monthly and Year-End Rating**

| Jul | Aug | Sep | Oct | Nov | Dec | Jan (MY) | Feb | Mar | Apr | May | Jun | YE Rating |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | 3 |

**Manager Signature & Date:**

**Employee Signature & Date:**

Updated: 10/29/2019

NORTH
AMERICA
ESTÉE
LAUDER

# EXHIBIT "16"

FILED: NEW YORK COUNTY CLERK 11/28/2023 11:01 AM

NYSCEF DOC. NO. 18

INDEX NO. 161578/2023

RECEIVED NYSCEF: 11/28/2023

INTERNAL

## Team Member Annual Performance Review    Fiscal Year:

| | |
|---|---|
| Employee # | 1672458 |
| Name | Noe Arteaga |
| Position | Fragrance Advisor |

| | |
|---|---|
| Date of Review | |
| Location | EDPFM WV FSS |

Supervisor sets benchmark for goals. Employee collaboratively set, review goals

Review goals include sales goals, clienteling, leadership and KPIs by Brand

During visits, you discuss progress against the goals

If achieving ALL the goals set, you will receive a successful rating for the month

Year-End review rating is an aggregate of monthly ratings

### Employee Career Aspirations

Noe wishes to learn to work well within a boutique setting. He aspires to create a healthy clientele base that Noe can event within. Noe wishes to grow within the company in the corporate environment.

### Manager Year- End Comments

Noe has become a great ambassador for the brand. Noe has a substantial understanding of the brand and its message, and he does a good job of relaying this information to clients. Noe has strived to offer the best level of service to clients when it comes to matchmaking. In doing so, this will inadvertently be reflected in Noes overall productivity. Noe has a very personal approach that allows to identify each client needs. Noe has worked on increasing personal KPI metrics as it relates to service and delivery. Within six months Noe has contributed with personal sales of $91K 16% to the stores overall sales with an AUS of $171 and an IPT of 1.4

- **Philosophy/brand identity** – successful (Noe has been successful in learning about the brand in depth and in a way that clients appreciate.)
- **Selling ceremony (matchmaking)** – successful (Noes consultations are very thorough, Noe does a good job asking questions to determine what the client may like)
- **Perfume map** – successful (Noe spends time in each consultation reviewing the perfumes and additional products the collection has to offer. Noe romances each item as they relate to the perfume map and explains the benefits which is a good way to sell additional pieces.)
- **Client capture/clientele** – successful (Noe is continuing to build on the personal client base. Strong follow up with clients has insured they return to shop with him)
- **Team player** – successful
- **Time and attendance** - Noe has been tardy multiple times. The concern has been addressed, Noe is putting stronger efforts in complying with the company's time and attendance policy.
- **Communication** -

### SUCCESSES:

Noe has received nine customer complementary letters and one google review within the past six months. Noe has successfully collaborated with the neighborhood hotels and the local businesses on the referral program that generated $11.2K and added 75 new clients to the store within three months.

In FY 23 I would like to see Noe build stronger personal client base and increase it by 25%. I would like Noe to independently execute VIP events and focus on individualized consultations in store and virtually.

Updated: 10/29/2019

NORTH AMERICA
ESTÉE LAUDER COMPANIES

FILED: NEW YORK COUNTY CLERK 11/28/2023 11:01 AM

NYSCEF DOC. NO. 18

INDEX NO. 161578/2023

RECEIVED NYSCEF: 11/28/2023

INTERNAL

## Employee Year- End Comments

| Rating | Rating Category | # | Rating Summary |
|---|---|---|---|
| ● | Needs significant improvement | 1 | Contributions were inconsistent. Did not leverage HPLC. |
| ○ | Makes a contribution | 2 | Achieved partial results, displayed inconsistent performance and required regular assistance. Leveraged some HPLC. |
| ● | Successful | 3 | Achieved results and key business goals. Sometimes exceeded job requirements and leveraged HPLC. |
| ○ | Exemplary | 4 | Exceeded key business goals and often exceeded job requirements. Often achieved high performance and demonstrated HPLC. |

**Please record monthly ratings below. The Mid-Year (MY) Rating should be a cumulative rating YTD

| | | | Monthly and Year-End Rating | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jul | Aug | Sep | Oct | Nov | Dec | Jan (MY) | Feb | Mar | Apr | May | Jun | YE Rating |
| | | | | | | | | | | | | 3 |

Employee Signature & Date: _____

Manager Signature & Date: _____

NORTH | ESTÉE
AMERICA | LAUDER

Updated: 10/29/2019

EXHIBIT "17"

## US Retail – Employee Documentation Form

*\*\*Hover over blue text for tips\*\**

| Employee Information | |
|---|---|

| | | | |
|---|---|---|---|
| **Employee Name:** | Theresa Spiegel | **Date:** | 08/02/2022 |
| **Employee ID:** | 1630976 | **Job Title:** | Store Manager |
| **Manager:** | Lusine Jacobs | **Work Location:** | Frederic Malle FSS -Greenwich |

| Level of Documentation (select one) |
|---|

☐ Written Counseling      ☐ Written Warning      ☒ Final Warning

| Type of Offense |
|---|

☐ Productivity

☒ Standards of Conduct/Performance
• Violation of any applicable time-keeping policy

• Unsatisfactory job performance

**Previous Action:** Written Warning      **Date Administered:** 08/05/2022

| Summary Details of Violation |
|---|



**FILED: NEW YORK COUNTY CLERK 11/28/2023 11:01 AM** INDEX NO. 161578/2023
NYSCEF DOC. NO. 19    RECEIVED NYSCEF: 11/28/2023

Case 1:23-cv-11269-DEC    Document 1-4    Filed 12/27/23    Page 97 of 99

## US Retail – Employee Documentation Form

### Work Force Management (WFM)

Theresa, being efficient on WFM (workforce management) is a store managers primary responsibility. On 1/14/22 you were administered a written counseling due to continuous errors on WFM. You were coached to review all previous training recordings that I have provided you and encouraged to attend all the WFM System trainings that you've been scheduled. The Training dates were: 1/12/22, 2/16/22, 3/31/22, 4/13/22, 5/11/22, 6/8/22. In addition, I have dedicating time on Sundays to close the pay period with you to guide you through and answer any questions you might have during the process.

WFM continues to be an ongoing challenge which has results in you contacting several of your colleagues weekly.

It is required of all store managers to sign in as an employee on WFM when their adjusting the schedule or when submitting requests for themselves. This expectation has been communicated to you several times and reiterated during every WFM training monthly. However, you've continued to adjust your personal schedule and approve your own changes without properly notifying me.

### Time and Attendance

Theresa, you are not consistently delivering time and attendance documentation and holding your team accountable. On 5/6/22 during our HR touch base with TJ Crawford, HRBP we went over the importance of holding all employees accountable on the time and attendance consistently and completing the documentation in a timely manner .

On 6/9/22, your employee Noe was tardy, bringing him to the next level of documentation and you did not administer the documentation, nor did you make me aware of the infraction. When I asked why the documentation was not prepared, sent to me for approval and delivered your response was "I was very busy". This is unacceptable and cannot continue to occur.

### Oversharing of Information

You have repeatedly shared detailed information with your colleagues specific to employee challenges and concerns.

On 4/17/22 you called the manager at the Madison Ave FSS to discuss details of challenges you are working through with one of your employee Noe. In the conversation you were very open about the name of the employee, the problems that you have been having, dates, and times along with asking on how to proceed with documentations. On 5/28/22 you called to tell your colleague that you were very stressed out because of Noe. You over shared the specific incident of sending Noe home for the wrinkled linen shirt. Sharing how Noe is always late. On 5/30/22 you shared that you can't understand Noe's personality traits; that Noe called out several days in a row and went to California for vacation and that you no longer trust Noe when Noe calls out sick because you can't tell anymore when Noe is telling the truth.

This level of information should not be shared with your colleague and maybe perceived as gossip.

Most recently on 7/27/2022 during an Education store visit with your Field Executive Training Manager (FETM), you brought up concerns about your employee Noe on the sales floor while he was servicing a client and only steps away from you. The concerns raised were not constructive and unrelated to the employee's overall performance. Furthermore, these concerns should not have been raised on the floor in front of a client.

### Time Management

We've had numerous conversations regarding work related tasks to be completed during work hours with no exception. I have advised you that if there are circumstances preventing you from attending these trainings, meetings or adjusting your schedule, it is expected for you to communicate in a timely manner allowing me time to make the appropriate arrangements for you to receive the recordings of the training or otherwise schedule you on a different day.

All mandatory trainings that are scheduled during your time off is communicated with enough time for you to partner with me on any schedule changes you may need to make to ensure you're working during the trainings.

**1/18/22 FSS Info Link Training**-The invitation was sent out on 1/7/2022 providing enough time for you to partner with me to adjust your schedule accordingly. The schedule was not adjusted or otherwise communicated. You joined the meeting from home on a personal device where the host was having difficulties hearing you during attendance check in time. You then left the meeting due to having difficulties connecting.
**2/17/22 Physical Inventory Prep Call** – Theresa, you did not adjust the schedule accordingly to attend the mandatory inventory prep training for the FSS-you had RSVP'd to the meeting.
**3/31/22 Work Force Management Training** – Theresa, you did not adjust your schedule accordingly as advised on 3/24/2022 to attend the training - however, you had confirmed that you will attend the training on two different occasions: 3/25/2022 and 3/31/2022 an hour prior to the call. Adjustments to the schedule were not done but you went to the store for one hour to attend virtual training without proper schedule adjustment or communication.

Theresa repeatedly makes schedule adjustments modifications during her time off. Most recently on 4/11/22 you were scheduled to work at 10 AM however 11 modifications have been done between 8:44 AM and 8:57AM.

### Productivity Details

**\*\*Double click on table to enter information\*\***

| Sales Month | Date | Store Goal | Store Actual | (+)Up/(-)Down | EE Goal | EE Actual | (+)Up/(-)Down |
|---|---|---|---|---|---|---|---|
| | | | | #DIV/0! | | | #DIV/0! |
| | | | | #DIV/0! | | | #DIV/0! |
| | | | | #DIV/0! | | | #DIV/0! |
| | | | | #DIV/0! | | | #DIV/0! |
| | | | | #DIV/0! | | | #DIV/0! |
| | | | | #DIV/0! | | | #DIV/0! |

### Action Plan



# EXHIBIT "18"

INTERNAL



Monday, November 14, 2022

Theresa Spiegel
Delivered via electronic mail

**RE: Termination of Employment**

Dear Theresa,

Effective November 14, 2022 your position with the Estee Lauder Companies will terminate

due to your inability to meet company standards.

Any final monies owed, will be forwarded to the address on file.

Best Regards,

Jenne Eugene, MSHRM
Human Resources Director - Retail Field & POS
East Region, North America