# EXHIBIT "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

THERESA SPIEGEL,

                         PLAINTIFF,            **SECOND**

—against—                              **AMENDED COMPLAINT**
                                                         Case No.: 23-cv-11209
                                                         (DLC)(OTW)

                                                         DEMAND TRIAL BY JURY

ESTÉE LAUDER INC., ESTÉE LAUDER COMPANIES, INC.,
ELC BEAUTY LLC, ESTÉE LAUDER INTERNATIONAL INC.,
LUSINE JACOBS, NOE ARTEAGA, ANGELINA MILLER
and JENNE EUGENE

                                           Defendant(s)
------------------------------------------------------------------X

PLAINTIFF, by her attorneys Tanner and Ortega LLP, complains of the defendants and alleges, upon information and belief:

### NATURE OF THE CASE

1. This is an employment discrimination and civil rights action against Defendants, ESTÉE LAUDER Inc., ESTÉE LAUDER COMPANIES, INC., ELC BEAUTY LLC, ESTÉE LAUDER INTERNATIONAL INC., (hereinafter collectively ELC), LUSINE JACOBS (hereinafter JACOBS), NOE ARTEAGA (hereinafter ARTEAGA), ANGELINA MILLER (hereinafter MILLER) and JENNE EUGENE (hereinafter EUGENE) arising under New York City Human Rights Law §8-107 and New York State Human Rights Law §296(a) et seq., and *42 U.S.C. § 1981*.

2. PLAINTIFF, a 71 year old white, cisgender, heterosexual female, was an employee of Defendants ELC as a Store Manager from April 2019 to November 14, 2022.

1

3. At all times, PLAINTIFF's performance was satisfactory or better. Despite PLAINTIFF's satisfactory performance, she was discriminated against on the basis of her race, her age and her gender-identity

## JURISDICTION AND VENUE

4. The Supreme Court of the State of New York, County of New York has original jurisdiction over PLAINTIFF's claims pursuant to *New York CPLR § 301* and *§ 302*.

5. This matter is presently Removed to the Southern District of New York pursuant to 28 USC §§ 1331, 1343 and 1441 however, notwithstanding same, PLAINTIFF asserts that there is no basis for the assertion of Federal Jurisdiction over the Amended Complaint, which instead must be remanded to State Court.

## PARTIES

6. PLAINTIFF resides in the County of New York and State of New York.

7. PLAINTIFF is a white, cisgender, heterosexual female who is 71 years old.

8. Defendant ESTÉE LAUDER INC. was a registered Domestic Business Corporation with the New York State Department of State, Division of Corporations.

9. Defendant ESTÉE LAUDER INC. is a wholly owned subsidiary of Defendant ESTÉE LAUDER COMPANIES, INC.,

10. Defendant ELC BEAUTY LLC, is a registered Foreign Limited Liability Corporation with the New York State Department of State, Division of Corporations and authorized to do business in New York State.

11. Defendant ELC BEAUTY LLC is a wholly owned subsidiary of Defendant Estée Lauder Companies, Inc.

12. Defendant ESTÉE LAUDER COMPANIES INC. is a registered Foreign Business Corporation with the New York State Department of State, Division of Corporations authorized to do business in New York State

13. Defendant ESTÉE LAUDER COMPANIES, INC. is a publicly held corporation which wholly owns Defendants ESTÉE LAUDER INC. and ELC BEAUTY LLC.

14. Defendant ESTÉE LAUDER INTERNATIONAL INC. is a registered Foreign Business Corporation with the New York State Department of State, Division of Corporations authorized to do business in New York State.

15. Defendant ESTÉE LAUDER INTERNATIONAL INC. is a wholly owned subsidiary of Defendant ESTÉE LAUDER INC. which is a wholly owned subsidiary of Defendant ESTÉE LAUDER COMPANIES, INC.

16. PLAINTIFF was hired and employed in April 2019 by Defendant ELC BEAUTY LLC.

17. PLAINTIFF was also an employee of Defendant ESTÉE LAUDER COMPANIES, INC. as indicated in Exhibit "10", wherein the email from Kathryn Guarini to PLAINTIFF dated May 31, 2022, is identified as "The Estee Lauder Companies, Human Resources Manager-Retail & Field-Est Region, North America".

18. For additional proof that PLAINTIFF was also employed by Defendant ESTÉE LAUDER COMPANIES, INC., see Exhibit "17", Defendants' "Final Warning" letter to PLAINTIFF dated August 2, 2022. The Final Warning form is pre-printed on the bottom right hand corner with ESTÉE LAUDER COMPANIES, INC.

19. That at all times hereinafter mentioned PLAINTIFF was an employee of Defendant ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC as the Manager of the Frederic Malle Editions de Parfums boutiques store, a division of ELC, in Greenwich Village, NYC.

20. Upon information and belief, at all times hereinafter mentioned Defendant JACOBS was an employee of Defendant ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC, with the title of Northeast Field Executive.

21. Upon information and belief, at all times hereinafter mentioned Defendant ARTEAGA was an employee of Defendant ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC, with the title of Fragrance Adviser at the boutique store in Greenwich Village, NYC

22. Upon information and belief, at all times hereinafter mentioned Defendant MILLER was an employee of Defendant ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC, with the title of Field Executive, Sales Manager.

23. Upon information and belief, at all times hereinafter mentioned Defendant EUGENE was an employee of Defendant ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC, assigned to the Human Resources Department.

## FACTUAL BACKGROUND

24. In April 2019, PLAINTIFF was hired by Defendant ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC as the Manager of the Frederic Malle Greenwich Village, NYC store and worked in that capacity, until her termination on November 14th 2022.

4

25. While the Manager of the Greenwich Village store, PLAINTIFF was very successful with sales, both for the store and her personal sales.

26. In Fiscal Year 2022, from July 2021 to June 2022, under PLAINTIFF's management, the Greenwich Village store sales increased 83% over the previous year. During that same fiscal year, PLAINTIFF's personal sales were 56% of the overall total store sales, while the total sales of the other two salespeople was 44% combined.

27. This superior performance was the result of PLAINTIFF's consistent dedication and hard work, her sales skills, customer service skills, and management skills.

### ESTÉE LAUDER EMPLOYEE REVOLT
### PRECIPITATES AD HOC MEASURES TO THEIR EMPLOYMENT RULES

28. On June 2, 2020 ELC experienced internal corporate tumult which prompted the Corporate leadership and management to make significant strategic and structural changes to their employee standards incorporating ad hoc measures to appease a significant cultural interest group to avoid potential discrimination lawsuits and fallout[1].

---

[1] PLAINTIFF provides a historical background to Defendant's ELC BEAUTY LLC's adoption of ad hoc employment measures brought on by the aforesaid circumstances: On June 2, 2020 ELC, a large group of Black Estée Lauder employees wrote a letter to William Lauder, Executive Chairman of ELC (See Exhibit 1). This letter demanded that Ronald Lauder, the CEO, and a son of the ELC founders, be removed from the Company.

Said letter was sent while well-publicized disturbances and destructive riots were taking place throughout the country as a reaction to George Floyd's death while in police custody, with allegations of systematic White violence against Blacks.

The basis of the letter demanding Ronald Lauder's removal as CEO, was that Mr. Lauder had donated approximately $1.7 million to Donald Trump's political campaigns over the previous few years. At that time, Donald Trump was President of the United States.

The employee group found this intolerable, since they believed that President Trump was equivalent to "*state sponsored violence and racism*" against Blacks, as expressed in the letter.

The employee group also objected that Ronald Lauder once called former President Trump "*a man of incredible insight and intelligence.*" (Cont'd to page 6)

5

29. These changes were the result of ad hoc measures taken by ELC to appease a significant cultural interest group.

30. These changes adversely affected PLAINTIFF's work conditions, which before this were consistently productive and harmonious, both with her superiors and subordinates.

31. These changes included a disproportionate favoritism for Blacks and members of the LGBTQ movement, and discrimination towards Whites and heterosexuals.

---

(Cont'd from page 5) Black Lives Matter ("BLM"), a militant race-based organization, participated prominently in the ensuing negotiations with ELC on the matter of Ronald Lauder.

Under BLM pressure, Estée Lauder offered to donate $1 million to Black charities. BLM and the employees did not accept this offer as adequate and demanded the resignation of Ronald Lauder from the company and a payment of $5 million to Black causes.

ELC was afraid of being branded a racist company, with adverse publicity and boycotts. As they branded Ronald Lauder a racist because he donated to Trump's campaigns.

Estée Lauder agreed to pay $10 million to the NAACP. The Company also agreed to hire a great number of Black and other minorities, and to develop many more products targeted for Blacks. ELC also agreed to purchase $25 million in supplies and services from Black-owned businesses. (See Exhibit 2 & 3)

ELC also agreed to conduct mandatory training for all employees, so they would be made aware of their unconscious biases at the workplace and follow instructions as to how to eliminate those unconscious and discriminatory thoughts and actions.

ELC agreed to immediately establish a new department, the Equity and Engagement Center of Excellence ("COE"), to monitor and enforce the new concessions. Nicole Monson was chosen to head this department in order to appease and co-opt BLM and its allies.

ELC embraced BLM related causes including LGBTQ issues (See Exhibits 4 & 5).

It is a well-known fact that the BLM movement is a youth and student activist oriented movement which has always been heavily in support of the LGBTQ and other so-called liberation movements.

The BLM Movement espouses being WOKE or awake to Social Justice causes of inclusivity and diversity but strategically seeks to impose conformity to divisive political-correctness thereby encouraging the adoption of the very stifling discriminatory behavior they seek to change.#

6

### *Def. ARTEAGA is hired by Defendants ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC*

32. Upon information and belief, in early September 2021, Defendant ARTEAGA applied for a salesperson position that was available at the Greenwich Village store which PLAINTIFF managed.

33. Upon information and belief Def. ARTEAGA is a Hispanic male in his early 30's, who actively identified with multiple overlapping intersectional BLM causes.

34. Upon information and belief Def. ARTEAGA strongly identified with gender orientation and identity classifications based on the LGBTQ movement.

35. Upon information and belief PLAINTIFF was the first Manager at ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC to interview Def. ARTEAGA for the sales position.

36. During that interview, Def. ARTEAGA stated that he needed 2 weeks off as an unpaid leave of absence (LOA) shortly after he would begin work in December 2021 and January 2022, so he could attend his sister's wedding in California.

37. This requested LOA was mostly in a Company Blackout period, when any time off for retail staff was prohibited, due to the busy holiday season. PLAINTIFF explained to Def. ARTEAGA that this request could only be approved by her supervisors, defs. JACOBS and MILLER. Both JACOBS and MILLER would also need to interview ARTEAGA, as part of the hiring process.

38. Accordingly, in September 2021, PLAINTIFF called Def. JACOBS, her direct supervisor, to relate the particulars of her job interview with ARTEAGA.

39. When PLAINTIFF explained ARTEAGA's request for the LOA in December and January, Def. JACOBS asked if PLAINTIFF would be able to staff the store properly with ARTEAGA being absent for 2 weeks in the Blackout period. PLAINTIFF told Def. JACOBS that she would be able to run the store properly.

40. Later in September 2021, Def. JACOBS called PLAINTIFF and told her that Def. ARTEAGA had been interviewed separately by both her and MILLER, and that they approved his hiring with the LOA request granted.

41. On October 3, 2021, Def. ARTEAGA started work as a fragrance advisor (sales associate) at the Greenwich Village store, with PLAINTIFF as his manager.

42. After Def. ARTEAGA'S hiring, the Greenwich Village store had three employees working there, PLAINTIFF, Giovanni Trujillo, ("Trujillo") (sales associate) and Def. ARTEAGA.

43. Upon starting work, Def. ARTEAGA confirmed to PLAINTIFF that both Defs. JACOBS and MILLER had approved his request for an unpaid LOA in December 2021 and January 2022.

44. On November 10, 2021, PLAINTIFF, as required, submitted the store staffing schedule for December 2021 to Def. JACOBS for approval. This schedule reflected the previously approved LOA for Def. ARTEAGA.

45. On November 13, 2021, Def. JACOBS approved the December schedule, and PLAINTIFF then posted this schedule in the store for the staff to view.

46. On December 10, 2021, PLAINTIFF once again, as required, submitted the store staffing schedule for January 2022 to Def. JACOBS for approval. This schedule reflected the balance of the previously approved LOA for Def. ARTEAGA, in January 2022.

47. On December 13, 2021, Def. JACOBS approved the January schedule, and PLAINTIFF then posted the schedule in the store.

8

48. From December 19, 2021, to January 5, 2022, Def. ARTEAGA was away from the store on his Leave of Absence.

49. On December 21, 2022, while Def. ARTEAGA was on his scheduled unpaid LOA, Def. JACOBS called PLAINTIFF to ask why ARTEAGA was not working.

50. PLAINTIFF told Def. JACOBS that Def. ARTEAGA was on the LOA approved by JACOBS, and by MILLER, as a condition of ARTEAGA's hiring. Def. JACOBS claimed that she and def. MILLER did not approve a 2-week LOA, but only a leave for "a long weekend," as she put it.

51. PLAINTIFF informed Def. JACOBS that Def. ARTEAGA had confirmed that the LOA had been approved by both JACOBS and MILLER for 2 weeks, and not for merely "a long weekend."

### *PLAINTIFF's First Write-up*

52. On January 6, 2022, defs. JACOBS and MILLER delivered a first write-up to PLAINTIFF. (See Exhibit 6). A prominent part of this write-up cited PLAINTIFF for posting the December and January store staffing schedules without approval from Def. JACOBS.

53. Said write-up, written by Defs. JACOBS and MILLER, falsely accused PLAINTIFF of misconduct. However, upon information and belief, its purpose was to falsely blame PLAINTIFF for an unauthorized approval of the LOA during a Company Blackout period, so as to conceal from their superiors that they, Defs. JACOBS and MILLER, were the ones who had approved the full 2-week LOA for Def. ARTEAGA.

### *ARTEAGA's Continuous Company Rules Violations*

54. On or about November 2021, Def. JACOBS arrived at the store for work-related business. She observed Def. ARTEAGA working in his salesperson capacity, while wearing an excessively wrinkled shirt, which was prohibited by the published "**Frederic Malle**

9

**Personal Grooming Guide**" (See Exhibit 7). Def. JACOBS told PLAINTIFF that this was unacceptable, and if she were the store manager, that she would send ARTEAGA home and not permit him to work in disheveled clothing.

55. Following Def. JACOBS' instruction regarding not wearing wrinkled clothing to work, PLAINTIFF instructed Def. ARTEAGA that he no longer could report to work wearing clothing that was in violation of the established dress code.

56. Def. ARTEAGA argued with PLAINTIFF and expressed the opinion that he should be allowed to wait on customers wearing wrinkled clothing. Rather than agreeing to comply with the long standing company rule, ARTEAGA instead claimed that this Company policy was "*racist,*" since "*it is well known that people of color like to dress like that,*" as he described it to PLAINTIFF.

57. From November 2021 to May 2022, Def. ARTEAGA reported to work late on 26 separate occasions.

58. PLAINTIFF spoke with Def. ARTEAGA multiple times about his lateness. ARTEAGA was argumentative and insubordinate, and refused to alter in any manner his arrival time.

59. PLAINTIFF reported all of Def. ARTEAGA's lateness to Def. JACOBS, as required. PLAINTIFF asked permission on multiple occasions from Def. JACOBS to write up ARTEAGA for lateness. Def. JACOBS repeatedly refused to allow any write-up.

60. Finally, in May 2022, and after Def. ARTEAGA was late 26 times in a 6-month period, Def. JACOBS assented, and Def. ARTEAGA was written up by PLAINTIFF for his lateness (Exhibit 8).

61. Yet, even after this write-up, ARTEAGA continued to come to work late.

62. In June 2022, Def. ARTEAGA was issued a "*2nd and Final Warning*" by PLAINTIFF over his continued lateness (Exhibit 9)

63. Def. JACOBS explained to PLAINTIFF and Def. ARTEAGA that this final warning meant that if he were late even one more time during the next 6 months that it could result in his termination.

64. Even after the final warning, Def. ARTEAGA was late on 2 more occasions.

65. When PLAINTIFF reported this to Def. JACOBS, she instructed PLAINTIFF to falsely manipulate the time record, so it would not reflect Def. ARTEAGA's continued lateness.

66. In March 2021, Def. ARTEAGA called out sick for 3 days, and was given sick pay for these days. He told PLAINTIFF that he was very sick and needed to visit a doctor for treatment and to have medication prescribed.

67. PLAINTIFF was later informed by Trujillo that Def. ARTEAGA was in fact not sick, but instead had traveled to Los Angeles for a social visit.

68. PLAINTIFF reported this to Defs. JACOBS and EUGENE of HR, who both told PLAINTIFF they would do nothing about ARTEAGA lying. They did not question ARTEAGA about this incident.

69. Def. ARTEAGA requested time off from work, for August 12–17, 2022. He informed PLAINTIFF that he needed to go to Los Angeles to be near his family where his infant niece would undergo a serious spinal operation at a hospital. Given the circumstances explained by Def. ARTEAGA, the time off was approved.

70. Upon information and belief, once again, Def. ARTEAGA lied about the reason for his need for time off. PLAINTIFF once again discovered that Def. ARTEAGA had instead traveled to Europe for social visits and partying as shown on his social media posts.

71. In March 2022, Def. JACOBS spoke with PLAINTIFF about Def. ARTEAGA's inadequate sales figures, since he was the lowest-performing salesperson at the store. She instructed PLAINTIFF to give *"counseling and coaching"* sessions to Def. ARTEAGA to

11

improve his sales. Prior to this, PLAINTIFF had spoken to Def. ARTEAGA about his poor sales numbers without any improvement.

72. When PLAINTIFF gave this instructed counseling session, Defendant ARTEAGA was argumentative, and insubordinate to PLAINTIFF, and his sales technique did not change, nor did his sales improve.

73. Approximately one month later, in April 2022, Def. JACOBS rebuked PLAINTIFF for not causing Def. ARTEAGA's sales to improve. Def. JACOBS told PLAINTIFF that she was not doing a good job over this, and perhaps she should not be working for ELC BEAUTY LLC.

### *PLAINTIFF ordered to comply with new Company rules*
### *ELC BEAUTY LLC. refusal to discipline Def. ARTEAGA*

74. On May 11, 2022, T.J. Crawford ("Crawford"), of Human Resources, called PLAINTIFF to instruct her that henceforth she was not to give compliments on personal appearance to co-workers. Before Crawford's call, PLAINTIFF had complimented Def. ARTEAGA on his haircut, he in turn complained about PLAINTIFF's compliment to HR and Def. JACOBS.

75. Upon information and belief, HR through Crawford's directive, singled out PLAINTIFF. Crawford's directive was not an established companywide rule, but was directed *only* to PLAINTIFF, nor was the directive given to Trujillo, the other sales person at the Greenwich Village boutique.

76. Upon information and belief, on May 11, 2022, Crawford from HR called Trujillo, to inform him that Def. ARTEAGA had complained about him to HR and Def. JACOBS.

77. Upon information and belief, according to Crawford, Def. ARTEAGA had observed Trujillo waiting on a customer, and when Trujillo was asked for advice about which perfumes were popular with men, he offered some suggestions.

78. Upon information and belief, based on the conversation between Trujillo and the customer, Def. ARTEAGA complained to HR and Def. JACOBS that this was offensive to him, since Trujillo's answer to the customer was not inclusive of men who identify with other LGBTQ categories. Crawford instructed Trujillo to keep this in mind when assisting customers in the future.

79. Upon information and belief, once again, Def. JACOBS' directive only singled out Trujillo and was not given by HR to any other ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC employee.

80. On June 1, 2022, PLAINTIFF received a call from JACOBS, instructing her that henceforth, she must address Def. ARTEAGA only by his name or the pronoun "their" [sic], as JACOBS put it. JACOBS informed PLAINTIFF that employees must be addressed only by the pronouns of their choice.

81. Upon information and belief, once again Def. JACOBS singled out PLAINTIFF, since the new pronoun rule was not given to any other employee of ELC BEAUTY LLC or Defendant ESTÉE LAUDER COMPANIES, INC, including Trujillo, who also worked with Def. ARTEAGA at the same store.

82. As irrefutable proof of ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC's intentionally discriminating against PLAINTIFF by singling her out to enforce the new policy regarding the use of pronouns. See Exhibit "16", Def. ARTEAGA's annual evaluation of July 2, 2022, prepared by Def. JACOBS <u>one month after</u> she told PLAINTIFF that she must henceforth use only the designated pronoun

"their" when referring to Def. ARTEAGA. Here Def. JACOBS writes: "Noe has a substantial understanding of the brand and its message, and <u>he does</u> a good job of relaying this information to clients." JACOBS furthermore writes: "strong follow up with clients has insured they return to shop <u>with him</u>." (Emphasis added)

83. It is to be noted that a copy of this evaluation was given to Def. ARTEAGA by Def. JACOBS, which clearly demonstrates that JACOBS herself did not take this pronoun mandate seriously, but was only using this falsely as a means to discriminate against PLAINTIFF.

84. And as further evidence that this pronoun mandate was being falsely used by ELC to discriminate against PLAINTIFF, see Exhibit "17", Final Warning letter issued to PLAINTIFF dated August 2, 2022. In the Final Warning letter under the category of "**Oversharing of Information**", Def. Jacobs writes: "*Most recently on 7/27/2022 during an Education store visit with your Field Executive Training Manager (FETM), you brought up concerns about your employee Noe on the sales floor while <u>he</u> was servicing a client and only steps away from you. The concerns raised were not constructive and unrelated to the employee's overall performance. Furthermore, these concerns should not have been raised on the floor in front of a client.*"(emphasis added)

85. Clearly Def. Jacobs refers to Def. ARTEAGA as "he" notwithstanding the fact that two months earlier on August 2, 2022, Def. Jacobs herself instructed PLAINTIFF to only refer to Def. ARTEAGA only by his name or the pronoun "*their*".

86. On May 28, 2022, Def. ARTEAGA once again reported to work wearing an excessively wrinkled shirt. As he had been told multiple times that this was not allowed, PLAINTIFF would not allow him to work. PLAINTIFF then immediately sent notice of Def. ARTEAGA's suspension to JACOBS and Kathryn Guarini ("Guarini") of HR.

87. On May 31, PLAINTIFF received an email from Guarini, (See Exhibit 10) stating that HR agreed with PLAINTIFF's decision, and that ARTEAGA would not be paid for the day he was sent home.

88. On June 2, 2022, Def. JACOBS called PLAINTIFF to tell her that ARTEAGA in fact would be paid for the day he was sent home by PLAINTIFF.

89. During the same call, Def. JACOBS told PLAINTIFF that Def. ARTEAGA would also be paid 3 ½ hours overtime, for telephone calls he made to JACOBS and HR that week on his day off.

90. On June 2, 2022, Def. JACOBS sent an email to all NYC employees of ELC, informing them of a new ELC Dress Code and Grooming Guideline, effective immediately. (See Exhibit 11)

91. This new Guideline expressly prohibited wearing wrinkled shirts to work.

92. Yet later that same day of June 2, 2022, JACOBS sent another email (See Exhibit 12) rescinding that day's new dress and grooming code.

93. JACOBS explained in that email (Exhibit 12) that she needed to check if it was applicable for North America, and would "*circle back later*," with an update. However, JACOBS never did follow up with instructions about the new dress code.

94. Upon information and belief, on June 7, 2022, Def. ARTEAGA received a book at work that he ordered, entitled "*How to be an Anti-Racist.*"

95. PLAINTIFF was off work the day the book arrived. Upon information and belief, Def. ARTEAGA left the book in a conspicuous place on PLAINTIFF's desk.

96. The next day, when PLAINTIFF arrived at work, she immediately saw the book, which was placed prominently on her desk by Def. ARTEAGA. (See Exhibit 13) "*How to be an*

15

*Anti-racist*," has a strong, racially motivated, anti-White theme, which PLAINTIFF found very offensive. On page 19, the Author, Ibram X Kendi writes the following:

> "The only remedy to racist discrimination is antiracist discrimination. The only remedy to past discrimination is present discrimination. The only remedy to present discrimination is future discrimination."

97. PLAINTIFF was extremely offended by Def. ARTEAGA's racially motivated actions against PLAINTIFF. Clearly, Def. Artega was sending PLAINTIFF a message that because he believed she was discriminating against him, the only remedy was for him to discriminate against PLAINTIFF.

98. In the beginning of June 2022, Def. ARTEAGA began wearing nail polish to work. First, he wore red polish, then black polish.

99. Wearing this color nail polish was against the policies of the ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC's Dress and Grooming Guide.

100. On June 16, 2022, PLAINTIFF sent an email to both Def. JACOBS and Guarini of HR, (see Exhibit 14) asking for clarification from ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC's regarding employees wearing black nail polish and dressing in excessively wrinkled shirts.

101. Neither Def. JACOBS nor HR ever responded to PLAINTIFF's email.

102. On June 17, 2022, PLAINTIFF spoke with Def. EUGENE of HR to discuss ARTEAGA's lateness problem and his chronic lying.

103. Def. EUGENE told PLAINTIFF that ELC BEAUTY LLC would not investigate the issue of ARTEAGA's lying.

16

104. During that same telephone call, PLAINTIFF asked EUGENE if the pronoun usage directive was companywide. EUGENE informed PLAINTIFF that the directive was not companywide.

105. On July 2, 2022, written evaluations for Fiscal Year 2022 (FY22), ending June 30, 2022, were presented at the store by Def. JACOBS to all boutique staff: PLAINTIFF, Trujillo, and Def. ARTEAGA.

106. For FY22, PLAINTIFF had tremendous performance success and was praised highly in her evaluation by JACOBS (see Exhibit 15). The store sales for FY22 were about $724,000, an increase over the previous year by 83%. PLAINTIFF's personal sales were $405,000, which was 56% of the total store sales. PLAINTIFF therefore made more sales than the other two salespeople combined.

107. Also in the FY22 evaluation, prepared by Defendant JACOBS, it states: *"Theresa is exemplary in providing luxurious customer experience. In FY22 she has received 18 customer complementary letters and four Google reviews. She is exemplary on planning and executing events successfully. She is exemplary on her personal productivity"*.

108. For the annual evaluations of Trujillo and Def. ARTEAGA, it was scheduled so that PLAINTIFF, as store Manager, would participate in the presentation of these evaluations, together with Def. JACOBS and the individual employee.

109. For Trujillo's evaluation, this procedure was followed, so his evaluation presentation was duly attended by Def. JACOBS, Trujillo, and PLAINTIFF.

110. However, for Def. ARTEAGA's evaluation presentation, Def. JACOBS ordered PLAINTIFF to view a company online tutorial that addressed unconscious bias and discrimination at the workplace, and how to overcome those practices and thoughts.

111. Upon information and belief, this was the same race-based tutorial that BLM pushed on ELC, as a condition of the previous settlement between them, as described above.

112. As a result of this abrupt change to the schedule, PLAINTIFF was unable to participate at all in the evaluation presentation for Def. ARTEAGA. No advance notice was given for this scheduling change that caused the exclusion of PLAINTIFF in the evaluation presentation.

113. Upon information and belief, PLAINTIFF, as Def. ARTEAGA's Manager, was prevented from including her comments and evaluations about Def. ARTEAGA's performance including his insubordination, intentional disregard for company rules including his documented time and attendance problems, his refusal to conform to company rules regarding attire and nail polish use, and his chronic and serious lying.

114. Upon information and belief, as Def. JACOBS was well aware, PLAINTIFF intended to enter into the record several negative comments about ARTEAGA's performance. Through Def. JACOBS' improper manipulations, PLAINTIFF's comments about ARTEAGA were prevented from being notated in his employment file.

115. PLAINTIFF informed Def. JACOBS, that as Def. ARTEAGA's Manager, she needed to review his evaluation. Def. JACOBS told PLAINTIFF that she could access the evaluation through the online Company files.

116. However when PLAINTIFF later attempted to do so, she was denied access to the computer file, as she learned that she was no longer listed as Def. ARTEAGA's direct Supervisor. Instead, the computer system listed Def. JACOBS as Def. ARTEAGA's immediate Supervisor.

117. Previously, PLAINTIFF was able to access Def. ARTEAGA's personnel files, since she was his supervisor and listed as such. However, without any notification to PLAINTIFF, this had been changed.

118. PLAINTIFF spoke with Def. JACOBS regarding this issue, and was told by Def. JACOBS that this listing of JACOBS as ARTEAGA's supervisor was an error, yet this was not true. Def. JACOBS never corrected the "*error*," and PLAINTIFF continued to be denied access to Def. ARTEAGA's file.

119. PLAINTIFF persisted in speaking to Def. JACOBS several times about this problem and demanded that she be given access to Def. ARTEAGA's personnel file, which by Company regulations she was entitled to do. Def. JACOBS repeatedly refused to allow PLAINTIFF access to the file.

120. Finally, on or about August 15, 2022, after more demands by PLAINTIFF, Def. JACOBS forwarded by email to PLAINTIFF the copy of ARTEAGA's evaluation (See Exhibit 16)

121. Even then, PLAINTIFF did not have access to Def. ARTEAGA's file online, since the "*error*" of Def. JACOBS being listed as ARTEAGA's supervisor was never corrected.

### *ELC BEAUTY LLC Failed to pay PLAINTIFF for work performed*

122. During her 3 ½ years of employment with defendant ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC., PLAINTIFF worked forty (40) hours per week. However, she would regularly arrive well before her start time to perform various work tasks before the store opened to the public. However, PLAINTIFF was not permitted to clock in before her scheduled start time. Upon information and belief, ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC. were aware that PLAINTIFF