UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------------X

THERESA SPIEGEL,

PLAINTIFF,                    **SECOND**

—against—                                          **AMENDED  COMPLAINT**
Case No.: 23-cv-11209
(DLC)(OTW)

DEMAND TRIAL BY JURY

ESTÉE LAUDER INC., ESTÉE LAUDER COMPANIES, INC.,
ELC BEAUTY LLC, ESTÉE LAUDER INTERNATIONAL INC.,
LUSINE JACOBS, NOE ARTEAGA, ANGELINA MILLER
and JENNE EUGENE

Defendant(s)

----------------------------------------------------------------------------X

PLAINTIFF, by her attorneys Tanner and Ortega LLP, complains of the defendants and alleges,

upon information and belief:

## NATURE OF THE CASE

1. This is an employment discrimination and civil rights action against Defendants, ESTÉE

   LAUDER Inc., ESTÉE LAUDER COMPANIES, INC., ELC BEAUTY LLC, ESTÉE

   LAUDER INTERNATIONAL INC., (hereinafter collectively ELC), LUSINE JACOBS

   (hereinafter JACOBS), NOE ARTEAGA (hereinafter ARTEAGA), ANGELINA MILLER

   (hereinafter MILLER) and JENNE EUGENE (hereinafter EUGENE) arising under New

   York City Human Rights Law §8-107 and New York State Human Rights Law §296(a) et

   seq., and *42 U.S.C. § 1981.*

2. PLAINTIFF, a 71 year old white, cisgender, heterosexual female, was an employee of

   Defendants ELC as a Store Manager from April 2019 to November 14, 2022.

1

3. At all times, PLAINTIFF's performance was satisfactory or better. Despite PLAINTIFF's satisfactory performance, she was discriminated against on the basis of her race, her age and her gender-identity

## JURISDICTION AND VENUE

4. The Supreme Court of the State of New York, County of New York has original jurisdiction over PLAINTIFF's claims pursuant to *New York CPLR § 301* and *§ 302*.

5. This matter is presently Removed to the Southern District of New York pursuant to 28 USC §§ 1331, 1343 and 1441 however, notwithstanding same, PLAINTIFF asserts that there is no basis for the assertion of Federal Jurisdiction over the Amended Complaint, which instead must be remanded to State Court.

## PARTIES

6. PLAINTIFF resides in the County of New York and State of New York.

7. PLAINTIFF is a white, cisgender, heterosexual female who is 71 years old.

8. Defendant ESTÉE LAUDER INC. was a registered Domestic Business Corporation with the New York State Department of State, Division of Corporations.

9. Defendant ESTÉE LAUDER INC. is a wholly owned subsidiary of Defendant ESTÉE LAUDER COMPANIES, INC.,

10. Defendant ELC BEAUTY LLC, is a registered Foreign Limited Liability Corporation with the New York State Department of State, Division of Corporations and authorized to do business in New York State.

11. Defendant ELC BEAUTY LLC is a wholly owned subsidiary of Defendant Estée Lauder Companies, Inc.

12. Defendant ESTÉE LAUDER COMPANIES INC. is a registered Foreign Business Corporation with the New York State Department of State, Division of Corporations authorized to do business in New York State

13. Defendant ESTÉE LAUDER COMPANIES, INC. is a publicly held corporation which wholly owns Defendants ESTÉE LAUDER INC. and ELC BEAUTY LLC.

14. Defendant ESTÉE LAUDER INTERNATIONAL INC. is a registered Foreign Business Corporation with the New York State Department of State, Division of Corporations authorized to do business in New York State.

15. Defendant ESTÉE LAUDER INTERNATIONAL INC. is a wholly owned subsidiary of Defendant ESTÉE LAUDER INC. which is a wholly owned subsidiary of Defendant ESTÉE LAUDER COMPANIES, INC.

16. PLAINTIFF was hired and employed in April 2019 by Defendant ELC BEAUTY LLC.

17. PLAINTIFF was also an employee of Defendant ESTÉE LAUDER COMPANIES, INC. as indicated in Exhibit "10", wherein the email from Kathryn Guarini to PLAINTIFF dated May 31, 2022, is identified as "The Estee Lauder Companies, Human Resources Manager-Retail & Field-Est Region, North America".

18. For additional proof that PLAINTIFF was also employed by Defendant ESTÉE LAUDER COMPANIES, INC., see Exhibit "17", Defendants' "Final Warning" letter to PLAINTIFF dated August 2, 2022. The Final Warning form is pre-printed on the bottom right hand corner with ESTÉE LAUDER COMPANIES, INC.

19. That at all times hereinafter mentioned PLAINTIFF was an employee of Defendant ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC as the Manager of the Frederic Malle Editions de Parfums boutiques store, a division of ELC, in Greenwich Village, NYC.

20. Upon information and belief, at all times hereinafter mentioned Defendant JACOBS was an employee of Defendant ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC, with the title of Northeast Field Executive.

21. Upon information and belief, at all times hereinafter mentioned Defendant ARTEAGA´ was an employee of Defendant ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC, with the title of Fragrance Adviser at the boutique store in Greenwich Village, NYC

22. Upon information and belief, at all times hereinafter mentioned Defendant MILLER was an employee of Defendant ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC, with the title of Field Executive, Sales Manager.

23. Upon information and belief, at all times hereinafter mentioned Defendant EUGENE was an employee of Defendant ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC, assigned to the Human Resources Department.

## FACTUAL BACKGROUND

24. In April 2019, PLAINTIFF was hired by Defendant ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC as the Manager of the Frederic Malle Greenwich Village, NYC store and worked in that capacity, until her termination on November 14th 2022.

4

25. While the Manager of the Greenwich Village store, PLAINTIFF was very successful with sales, both for the store and her personal sales.

26. In Fiscal Year 2022, from July 2021 to June 2022, under PLAINTIFF's management, the Greenwich Village store sales increased 83% over the previous year. During that same fiscal year, PLAINTIFF's personal sales were 56% of the overall total store sales, while the total sales of the other two salespeople was 44% combined.

27. This superior performance was the result of PLAINTIFF's consistent dedication and hard work, her sales skills, customer service skills, and management skills.

### *ESTÉE LAUDER EMPLOYEE REVOLT*
### *PRECIPITATES AD HOC MEASURES TO THEIR EMPLOYMENT RULES*

28. On June 2, 2020 ELC experienced internal corporate tumult which prompted the Corporate leadership and management to make significant strategic and structural changes to their employee standards incorporating ad hoc measures to appease a significant cultural interest group to avoid potential discrimination lawsuits and fallout[1].

---

[1]PLAINTIFF provides a historical background to Defendant's ELC BEAUTY LLC's adoption of ad hoc employment measures brought on by the aforesaid circumstances:  On June 2, 2020 ELC, a large group of Black Estée Lauder employees wrote a letter to William Lauder, Executive Chairman of ELC (See Exhibit 1).  This letter demanded that Ronald Lauder, the CEO, and a son of the ELC founders, be removed from the Company.

Said letter was sent while well-publicized disturbances and destructive riots were taking place throughout the country as a reaction to George Floyd's death while in police custody, with allegations of systematic White violence against Blacks.

The basis of the letter demanding Ronald Lauder's removal as CEO, was that Mr. Lauder had donated approximately $1.7 million to Donald Trump's political campaigns over the previous few years.  At that time, Donald Trump was President of the United States.

The employee group found this intolerable, since they believed that President Trump was equivalent to "*state sponsored violence and racism*" against Blacks, as expressed in the letter.

The employee group also objected that Ronald Lauder once called former President Trump "*a man of incredible insight and intelligence*."  (Cont'd to page 6)

29. These changes were the result of ad hoc measures taken by ELC to appease a significant

cultural interest group.

30. These changes adversely affected PLAINTIFF's work conditions, which before this were

consistently productive and harmonious, both with her superiors and subordinates.

31. These changes included a disproportionate favoritism for Blacks and members of the

LGBTQ movement, and discrimination towards Whites and heterosexuals.

---

(Cont'd from page 5) Black Lives Matter ("BLM"), a militant race-based organization,
participated prominently in the ensuing negotiations with ELC on the matter of Ronald Lauder.

Under BLM pressure, Estée Lauder offered to donate $1 million to Black charities. BLM and
the employees did not accept this offer as adequate and demanded the resignation of Ronald
Lauder from the company and a payment of $5 million to Black causes.

ELC was afraid of being branded a racist company, with adverse publicity and boycotts. As they
branded Ronald Lauder a racist because he donated to Trump's campaigns.

Estée Lauder agreed to pay $10 million to the NAACP. The Company also agreed to hire a great
number of Black and other minorities, and to develop many more products targeted for Blacks.
ELC also agreed to purchase $25 million in supplies and services from Black-owned businesses.
(See Exhibit 2 & 3)

ELC also agreed to conduct mandatory training for all employees, so they would be made aware
of their unconscious biases at the workplace and follow instructions as to how to eliminate those
unconscious and discriminatory thoughts and actions.

ELC agreed to immediately establish a new department, the Equity and Engagement Center of
Excellence ("COE"), to monitor and enforce the new concessions. Nicole Monson was chosen
to head this department in order to appease and co-opt BLM and its allies.

ELC embraced BLM related causes including LGBTQ issues (See Exhibits 4 & 5).

It is a well-known fact that the BLM movement is a youth and student activist oriented
movement which has always been heavily in support of the LGBTQ and other so-called
liberation movements.

The BLM Movement espouses being WOKE or awake to Social Justice causes of inclusivity and
diversity but strategically seeks to impose conformity to divisive political-correctness thereby
encouraging the adoption of the very stifling discriminatory behavior they seek to change.

*Def. ARTEAGA is hired by Defendants ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC*

32. Upon information and belief, in early September 2021, Defendant ARTEAGA applied for a salesperson position that was available at the Greenwich Village store which PLAINTIFF managed.

33. Upon information and belief Def. ARTEAGA is a Hispanic male in his early 30's, who actively identified with multiple overlapping intersectional BLM causes.

34. Upon information and belief Def. ARTEAGA strongly identified with gender orientation and identity classifications based on the LGBTQ movement.

35. Upon information and belief PLAINTIFF was the first Manager at ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC to interview Def. ARTEAGA for the sales position.

36. During that interview, Def. ARTEAGA stated that he needed 2 weeks off as an unpaid leave of absence (LOA) shortly after he would begin work in December 2021 and January 2022, so he could attend his sister's wedding in California.

37. This requested LOA was mostly in a Company Blackout period, when any time off for retail staff was prohibited, due to the busy holiday season. PLAINTIFF explained to Def. ARTEAGA that this request could only be approved by her supervisors, defs. JACOBS and MILLER. Both JACOBS and MILLER would also need to interview ARTEAGA, as part of the hiring process.

38. Accordingly, in September 2021, PLAINTIFF called Def. JACOBS, her direct supervisor, to relate the particulars of her job interview with ARTEAGA.

39. When PLAINTIFF explained ARTEAGA's request for the LOA in December and January, Def. JACOBS asked if PLAINTIFF would be able to staff the store properly with ARTEAGA being absent for 2 weeks in the Blackout period. PLAINTIFF told Def. JACOBS that she would be able to run the store properly.

40. Later in September 2021, Def. JACOBS called PLAINTIFF and told her that Def. ARTEAGA had been interviewed separately by both her and MILLER, and that they approved his hiring with the LOA request granted.

41. On October 3, 2021, Def. ARTEAGA started work as a fragrance advisor (sales associate) at the Greenwich Village store, with PLAINTIFF as his manager.

42. After Def. ARTEAGA'S hiring, the Greenwich Village store had three employees working there, PLAINTIFF, Giovanni Trujillo, ("Trujillo") (sales associate) and Def. ARTEAGA.

43. Upon starting work, Def. ARTEAGA confirmed to PLAINTIFF that both Defs. JACOBS and MILLER had approved his request for an unpaid LOA in December 2021 and January 2022.

44. On November 10, 2021, PLAINTIFF, as required, submitted the store staffing schedule for December 2021 to Def. JACOBS for approval. This schedule reflected the previously approved LOA for Def. ARTEAGA.

45. On November 13, 2021, Def. JACOBS approved the December schedule, and PLAINTIFF then posted this schedule in the store for the staff to view.

46. On December 10, 2021, PLAINTIFF once again, as required, submitted the store staffing schedule for January 2022 to Def. JACOBS for approval. This schedule reflected the balance of the previously approved LOA for Def. ARTEAGA, in January 2022.

47. On December 13, 2021, Def. JACOBS approved the January schedule, and PLAINTIFF then posted the schedule in the store.

8

48. From December 19, 2021, to January 5, 2022, Def. ARTEAGA was away from the store on his Leave of Absence.

49. On December 21, 2022, while Def. ARTEAGA was on his scheduled unpaid LOA, Def. JACOBS called PLAINTIFF to ask why ARTEAGA was not working.

50. PLAINTIFF told Def. JACOBS that Def. ARTEAGA was on the LOA approved by JACOBS, and by MILLER, as a condition of ARTEAGA's hiring. Def. JACOBS claimed that she and def. MILLER did not approve a 2-week LOA, but only a leave for "a long weekend," as she put it.

51. PLAINTIFF informed Def. JACOBS that Def. ARTEAGA had confirmed that the LOA had been approved by both JACOBS and MILLER for 2 weeks, and not for merely "a long weekend."

### *PLAINTIFF's First Write-up*

52. On January 6, 2022, defs. JACOBS and MILLER delivered a first write-up to PLAINTIFF. (See Exhibit 6). A prominent part of this write-up cited PLAINTIFF for posting the December and January store staffing schedules without approval from Def. JACOBS.

53. Said write-up, written by Defs. JACOBS and MILLER, falsely accused PLAINTIFF of misconduct. However, upon information and belief, its purpose was to falsely blame PLAINTIFF for an unauthorized approval of the LOA during a Company Blackout period, so as to conceal from their superiors that they, Defs. JACOBS and MILLER, were the ones who had approved the full 2-week LOA for Def. ARTEAGA.

### *ARTEAGA's Continuous Company Rules Violations*

54. On or about November 2021, Def. JACOBS arrived at the store for work-related business. She observed Def. ARTEAGA working in his salesperson capacity, while wearing an excessively wrinkled shirt, which was prohibited by the published "**Frederic Malle**

**Personal Grooming Guide**" (See Exhibit 7). Def. JACOBS told PLAINTIFF that this was unacceptable, and if she were the store manager, that she would send ARTEAGA home and not permit him to work in disheveled clothing.

55. Following Def. JACOBS' instruction regarding not wearing wrinkled clothing to work, PLAINTIFF instructed Def. ARTEAGA that he no longer could report to work wearing clothing that was in violation of the established dress code.

56. Def. ARTEAGA argued with PLAINTIFF and expressed the opinion that he should be allowed to wait on customers wearing wrinkled clothing. Rather than agreeing to comply with the long standing company rule, ARTEAGA instead claimed that this Company policy was "*racist*," since "*it is well known that people of color like to dress like that*," as he described it to PLAINTIFF.

57. From November 2021 to May 2022, Def. ARTEAGA reported to work late on 26 separate occasions.

58. PLAINTIFF spoke with Def. ARTEAGA multiple times about his lateness.  ARTEAGA was argumentative and insubordinate, and refused to alter in any manner his arrival time.

59. PLAINTIFF reported all of Def. ARTEAGA's lateness to Def. JACOBS, as required. PLAINTIFF asked permission on multiple occasions from Def. JACOBS to write up ARTEAGA for lateness.  Def. JACOBS repeatedly refused to allow any write-up.

60. Finally, in May 2022, and after Def. ARTEAGA was late 26 times in a 6-month period, Def. JACOBS assented, and Def. ARTEAGA was written up by PLAINTIFF for his lateness (Exhibit 8).

61. Yet, even after this write-up, ARTEAGA continued to come to work late.

62. In June 2022, Def. ARTEAGA was issued a "*2nd and Final Warning*" by PLAINTIFF over his continued lateness (Exhibit 9)

10

63. Def. JACOBS explained to PLAINTIFF and Def. ARTEAGA that this final warning meant that if he were late even one more time during the next 6 months that it could result in his termination.

64. Even after the final warning, Def. ARTEAGA was late on 2 more occasions.

65. When PLAINTIFF reported this to Def. JACOBS, she instructed PLAINTIFF to falsely manipulate the time record, so it would not reflect Def. ARTEAGA's continued lateness.

66. In March 2021, Def. ARTEAGA called out sick for 3 days, and was given sick pay for these days. He told PLAINTIFF that he was very sick and needed to visit a doctor for treatment and to have medication prescribed.

67. PLAINTIFF was later informed by Trujillo that Def. ARTEAGA was in fact not sick, but instead had traveled to Los Angeles for a social visit.

68. PLAINTIFF reported this to Defs. JACOBS and EUGENE of HR, who both told PLAINTIFF they would do nothing about ARTEAGA lying. They did not question ARTEAGA about this incident.

69. Def. ARTEAGA requested time off from work, for August 12–17, 2022. He informed PLAINTIFF that he needed to go to Los Angeles to be near his family where his infant niece would undergo a serious spinal operation at a hospital. Given the circumstances explained by Def. ARTEAGA, the time off was approved.

70. Upon information and belief, once again, Def. ARTEAGA lied about the reason for his need for time off. PLAINTIFF once again discovered that Def. ARTEAGA had instead traveled to Europe for social visits and partying as shown on his social media posts.

71. In March 2022, Def. JACOBS spoke with PLAINTIFF about Def. ARTEAGA's inadequate sales figures, since he was the lowest-performing salesperson at the store. She instructed PLAINTIFF to give "*counseling and coaching*" sessions to Def. ARTEAGA to

improve his sales. Prior to this, PLAINTIFF had spoken to Def. ARTEAGA about his poor

sales numbers without any improvement.

72. When PLAINTIFF gave this instructed counseling session, Defendant ARTEAGA  was

argumentative, and insubordinate to PLAINTIFF, and his sales technique did not change,

nor did his sales improve.

73. Approximately one month later, in April 2022, Def. JACOBS rebuked PLAINTIFF for not

causing Def. ARTEAGA's sales to improve.  Def. JACOBS told PLAINTIFF that she was

not doing a good job over this, and perhaps she should not be working for ELC BEAUTY

LLC.

### *PLAINTIFF ordered to comply with new Company rules*
### *ELC BEAUTY LLC. refusal to discipline Def. ARTEAGA*

74. On May 11, 2022, T.J. Crawford ("Crawford"), of Human Resources, called PLAINTIFF

to instruct her that henceforth she was not to give compliments on personal appearance to

co-workers. Before Crawford's call, PLAINTIFF had complimented Def. ARTEAGA on

his haircut, he in turn complained about PLAINTIFF's compliment to HR and Def.

JACOBS.

75. Upon information and belief, HR through Crawford's directive, singled out PLAINTIFF.

Crawford's directive was not an established companywide rule, but was directed *only* to

PLAINTIFF, nor was the directive given to Trujillo, the other sales person at the

Greenwich Village boutique.

76. Upon information and belief, on May 11, 2022, Crawford from HR called Trujillo, to

inform him that Def. ARTEAGA had complained about him to HR and Def. JACOBS.

12

77. Upon information and belief, according to Crawford, Def. ARTEAGA had observed
Trujillo waiting on a customer, and when Trujillo was asked for advice about which
perfumes were popular with men, he offered some suggestions.

78. Upon information and belief, based on the conversation between Trujillo and the customer,
Def. ARTEAGA complained to HR and Def. JACOBS that this was offensive to him, since
Trujillo's answer to the customer was not inclusive of men who identify with other
LGBTQ categories.  Crawford instructed Trujillo to keep this in mind when assisting
customers in the future.

79. Upon information and belief, once again, Def. JACOBS' directive only singled out Trujillo
and was not given by HR to any other ELC BEAUTY LLC and Defendant ESTÉE
LAUDER COMPANIES, INC employee.

80. On June 1, 2022, PLAINTIFF received a call from JACOBS, instructing her that
henceforth, she must address Def. ARTEAGA only by his name or the pronoun "their"
[sic], as JACOBS put it.  JACOBS informed PLAINTIFF that employees must be
addressed only by the pronouns of their choice.

81. Upon information and belief, once again Def. JACOBS singled out PLAINTIFF, since the
new pronoun rule was not given to any other employee of ELC BEAUTY LLC or
Defendant ESTÉE LAUDER COMPANIES, INC, including Trujillo, who also worked
with Def. ARTEAGA at the same store.

82. As irrefutable proof of  ELC BEAUTY LLC and Defendant ESTÉE LAUDER
COMPANIES, INC's intentionally discriminating against PLAINTIFF by singling her
out to enforce the new policy regarding the use of pronouns, See Exhibit "16", Def.
ARTEAGA's annual evaluation of July 2, 2022, prepared by Def. JACOBS one month
after she told PLAINTIFF that she must henceforth use only the designated pronoun

13

"their" when referring to Def. ARTEAGA. Here Def. JACOBS writes: "Noe has a substantial understanding of the brand and its message, and he does a good job of relaying this information to clients." JACOBS furthermore writes: "strong follow up with clients has insured they return to shop with him." (Emphasis added)

83. It is to be noted that a copy of this evaluation was given to Def. ARTEAGA by Def. JACOBS, which clearly demonstrates that JACOBS herself did not take this pronoun mandate seriously, but was only using this falsely as a means to discriminate against PLAINTIFF.

84. And as further evidence that this pronoun mandate was being falsely used by ELC to discriminate against PLAINTIFF, see Exhibit "17", Final Warning letter issued to PLAINTIFF dated August 2, 2022. In the Final Warning letter under the category of **"Oversharing of Information"**, Def. Jacobs writes: "*Most recently on 7/27/2022 during an Education store visit with your Field Executive Training Manager (FETM), you brought up concerns about your employee Noe on the sales floor while he was servicing a client and only steps away from you. The concerns raised were not constructive and unrelated to the employee's overall performance. Furthermore, these concerns should not have been raised on the floor in front of a client.*"(emphasis added)

85. Clearly Def. Jacobs refers to Def. ARTEAGA as "he" notwithstanding the fact that two months earlier on August 2, 2022, Def. Jacobs herself instructed PLAINTIFF to only refer to Def. ARTEAGA only by his name or the pronoun "*their*".

86. On May 28, 2022, Def. ARTEAGA once again reported to work wearing an excessively wrinkled shirt. As he had been told multiple times that this was not allowed, PLAINTIFF would not allow him to work. PLAINTIFF then immediately sent notice of Def. ARTEAGA's suspension to JACOBS and Kathryn Guarini ("Guarini") of HR.

87. On May 31, PLAINTIFF received an email from Guarini, (See Exhibit 10) stating that HR agreed with PLAINTIFF's decision, and that ARTEAGA would not be paid for the day he was sent home.

88. On June 2, 2022, Def. JACOBS called PLAINTIFF to tell her that ARTEAGA in fact would be paid for the day he was sent home by PLAINTIFF.

89. During the same call, Def. JACOBS told PLAINTIFF that Def. ARTEAGA would also be paid 3 ½ hours overtime, for telephone calls he made to JACOBS and HR that week on his day off.

90. On June 2, 2022, Def. JACOBS sent an email to all NYC employees of ELC, informing them of a new ELC Dress Code and Grooming Guideline, effective immediately. (See Exhibit 11)

91. This new Guideline expressly prohibited wearing wrinkled shirts to work.

92. Yet later that same day of June 2, 2022, JACOBS sent another email (See Exhibit 12) rescinding that day's new dress and grooming code.

93. JACOBS explained in that email (Exhibit 12) that she needed to check if it was applicable for North America, and would "*circle back later*," with an update. However, JACOBS never did follow up with instructions about the new dress code.

94. Upon information and belief, on June 7, 2022, Def. ARTEAGA received a book at work that he ordered, entitled "*How to be an Anti-Racist.*"

95. PLAINTIFF was off work the day the book arrived. Upon information and belief, Def. ARTEAGA left the book in a conspicuous place on PLAINTIFF's desk.

96. The next day, when PLAINTIFF arrived at work, she immediately saw the book, which was placed prominently on her desk by Def. ARTEAGA. (See Exhibit 13) "*How to be an*

15

*Anti-racist*," has a strong, racially motivated, anti-White theme, which PLAINTIFF found very offensive. On page 19, the Author, Ibram X Kendi writes the following:

*"The only remedy to racist discrimination is antiracist discrimination. The only remedy to past discrimination is present discrimination. The only remedy to present discrimination is future discrimination."*

97. PLAINTIFF was extremely offended by Def. ARTEAGA's racially motivated actions against PLAINTIFF. Clearly, Def. Artega was sending PLAINTIFF a message that because he believed she was discriminating against him, the only remedy was for him to discriminate against PLAINTIFF.

98. In the beginning of June 2022, Def. ARTEAGA began wearing nail polish to work. First, he wore red polish, then black polish.

99. Wearing this color nail polish was against the policies of the ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC's Dress and Grooming Guide.

100. On June 16, 2022, PLAINTIFF sent an email to both Def. JACOBS and Guarini of HR, (see Exhibit 14) asking for clarification from ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES. INC's regarding employees wearing black nail polish and dressing in excessively wrinkled shirts.

101. Neither Def. JACOBS nor HR ever responded to PLAINTIFF's email.

102. On June 17, 2022, PLAINTIFF spoke with Def. EUGENE of HR to discuss ARTEAGA's lateness problem and his chronic lying.

103. Def. EUGENE told PLAINTIFF that ELC BEAUTY LLC would not investigate the issue of ARTEAGA's lying.

104. During that same telephone call, PLAINTIFF asked EUGENE if the pronoun usage directive was companywide. EUGENE informed PLAINTIFF that the directive was not companywide.

105. On July 2, 2022, written evaluations for Fiscal Year 2022 (FY22), ending June 30, 2022, were presented at the store by Def. JACOBS to all boutique staff: PLAINTIFF, Trujillo, and Def. ARTEAGA.

106. For FY22, PLAINTIFF had tremendous performance success and was praised highly in her evaluation by JACOBS (see Exhibit 15). The store sales for FY22 were about $724,000, an increase over the previous year by 83%. PLAINTIFF's personal sales were $405,000, which was 56% of the total store sales. PLAINTIFF therefore made more sales than the other two salespeople combined.

107. Also in the FY22 evaluation, prepared by Defendant JACOBS, it states: "*Theresa is exemplary in providing luxurious customer experience. In FY22 she has received 18 customer complementary letters and four Google reviews. She is exemplary on planning and executing events successfully. She is exemplary on her personal productivity*".

108. For the annual evaluations of Trujillo and Def. ARTEAGA, it was scheduled so that PLAINTIFF, as store Manager, would participate in the presentation of these evaluations, together with Def. JACOBS and the individual employee.

109. For Trujillo's evaluation, this procedure was followed, so his evaluation presentation was duly attended by Def. JACOBS, Trujillo, and PLAINTIFF.

110. However, for Def. ARTEAGA's evaluation presentation, Def. JACOBS ordered PLAINTIFF to view a company online tutorial that addressed unconscious bias and discrimination at the workplace, and how to overcome those practices and thoughts.

17

111. Upon information and belief, this was the same race-based tutorial that BLM pushed on ELC, as a condition of the previous settlement between them, as described above.

112. As a result of this abrupt change to the schedule, PLAINTIFF was unable to participate at all in the evaluation presentation for Def. ARTEAGA. No advance notice was given for this scheduling change that caused the exclusion of PLAINTIFF in the evaluation presentation.

113. Upon information and belief, PLAINTIFF, as Def. ARTEAGA's Manager, was prevented from including her comments and evaluations about Def. ARTEAGA's performance including his insubordination, intentional disregard for company rules including his documented time and attendance problems, his refusal to conform to company rules regarding attire and nail polish use, and his chronic and serious lying.

114. Upon information and belief, as Def. JACOBS was well aware, PLAINTIFF intended to enter into the record several negative comments about ARTEAGA's performance. Through Def. JACOBS' improper manipulations, PLAINTIFF's comments about ARTEAGA were prevented from being notated in his employment file.

115. PLAINTIFF informed Def. JACOBS, that as Def. ARTEAGA's Manager, she needed to review his evaluation. Def. JACOBS told PLAINTIFF that she could access the evaluation through the online Company files.

116. However when PLAINTIFF later attempted to do so, she was denied access to the computer file, as she learned that she was no longer listed as Def. ARTEAGA's direct Supervisor. Instead, the computer system listed Def. JACOBS as Def. ARTEAGA's immediate Supervisor.

18

117. Previously, PLAINTIFF was able to access Def. ARTEAGA's personnel files, since she was his supervisor and listed as such. However, without any notification to PLAINTIFF, this had been changed.

118. PLAINTIFF spoke with Def. JACOBS regarding this issue, and was told by Def. JACOBS that this listing of JACOBS as ARTEAGA's supervisor was an error, yet this was not true. Def. JACOBS never corrected the "*error*," and PLAINTIFF continued to be denied access to Def. ARTEAGA's file.

119. PLAINTIFF persisted in speaking to Def. JACOBS several times about this problem and demanded that she be given access to Def. ARTEAGA's personnel file, which by Company regulations she was entitled to do. Def. JACOBS repeatedly refused to allow PLAINTIFF access to the file.

120. Finally, on or about August 15, 2022, after more demands by PLAINTIFF, Def. JACOBS forwarded by email to PLAINTIFF the copy of ARTEAGA's evaluation (See Exhibit 16)

121. Even then, PLAINTIFF did not have access to Def. ARTEAGA's file online, since the "*error*" of Def. JACOBS being listed as ARTEAGA's supervisor was never corrected.

## *ELC BEAUTY LLC **Failed to pay PLAINTIFF for work performed***

122. During her 3 ½ years of employment with defendant ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC., PLAINTIFF worked forty (40) hours per week. However, she would regularly arrive well before her start time to perform various work tasks before the store opened to the public. However, PLAINTIFF was not permitted to clock in before her scheduled start time. Upon information and belief, ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC. were aware that PLAINTIFF

was actually in the store preparing to open for the day because PLAINTIFF would be required to turn off the alarm upon arrival thus notifying ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC. that she was in the store.

123. ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC., never paid PLAINTIFF for her job performance during the times she arrived early to the store for which she would have been entitled to be paid as overtime.

124. Upon information and belief, the amount owed to PLAINTIFF is approximately $65,000.

## PLAINTIFF issued 2nd Write-up "Final Warning"

125. On August 2, 2022, PLAINTIFF was issued a second write-up, (See Exhibit 17) handed to her personally by Defs. JACOBS and MILLER together.

126. The August 2, 2022 write-up was issued as a "*Final Warning*" write-up, which meant that PLAINTIFF could be immediately terminated for any future infraction, no matter how minor.

127. Prominent in this write-up was an incident where PLAINTIFF spoke with the manager of the Frederic Malle store at Madison Avenue, NYC, during which PLAINTIFF allegedly discussed problems she was having with Def. ARTEAGA.

128. Def. JACOBS called this "*overreach*," and wrote up PLAINTIFF over the incident.

129. Def. JACOBS never questioned PLAINTIFF regarding the alleged conversation, before writing her up.

130. Previous to the final warning write-up, in June 2022, Def. JACOBS had chastised PLAINTIFF verbally over a coffee meeting PLAINTIFF had with Frederic Malle, the founder and creative director of the Frederic Malle brand of ELC BEAUTY LLC. Mr. Malle had requested that meeting.

131. At that meeting, PLAINTIFF was asked by Mr. Malle as to her professional opinion of Def. JACOBS. PLAINTIFF told him that her opinion of Def. JACOBS was negative.

132. Upon information and belief, having somehow heard of these negative comments about her, Def. JACOBS then rebuked PLAINTIFF for going to coffee with Mr. Malle, also calling it "*overreach.*"

133. On August 2, 2022, when PLAINTIFF was served with the "final warning" write-up, PLAINTIFF told Defs. JACOBS and MILLER the allegations in both write-ups against her were false.

### *PLAINTIFF seeks separation from ELC*

134. On September 12, 2022, PLAINTIFF, through retained counsel, notified ELC BEAUTY LLC that due to the continued illegal harassment, hostile work environment which was allowed to exist at the store, as well as the illegal discrimination by her supervisors and the Human Resources Department, that she was prepared to sue the Company, unless a severance were agreed to, whereby she would no longer work for the Company. After protracted negotiations between counsel for ELC BEAUTY LLC and PLAINTIFF'S counsel, a settlement could not be reached.

135. Upon information and belief, thereafter, Def. ARTEAGA, accused PLAINTIFF that during a private phone conversation between PLAINTIFF and a friend, Def. ARTEAGA overheard PLAINTIFF speaking negatively of him. He reported his complaint to HR.

### *PLAINTIFF placed on administrative leave*

136. On October 25, 2022, PLAINTIFF was placed on paid administrative leave over her personal telephone call, while Defendant ELC BEAUTY LLC investigated the phone call incident further. The paid leave continued until November 12, 2022.

137. As part of its "*investigation*", Def. ELC BEAUTY LLC through Def. EUGENE, wished to interview PLAINTIFF regarding the allegations made by Def. ARTEAGA.

138. At no point did PLAINTIFF refuse to cooperate with the "investigation".

139. PLAINTIFF was advised that the purpose of the initial phone call was to discuss with PLAINTIFF her experiences while supervising Def. ARTEGA.

140. PLAINTIFF was under the false impression that the subject matter of the phone call was to discuss her experiences with Def. ARTEGA. However, during said interview, Def. EUGENE immediately began to question PLAINTIFF re: the allegations made by Def. ARTEAGA against her.

141. During the interview of PLAINTIFF, Def. EUGENE indicated to PLAINTIFF that she would understand if PLAINTIFF wished to stop the interview and continue with her attorney present, since PLAINTIFF was being asked questions specifically relating to allegations made by Def. ARTEAGA.

142. At that point, PLAINTIFF informed Def. EUGENE that she in fact would prefer to continue the interview with her attorney present, and the interview ended.

143. In retaliation for PLAINTIFF's efforts to retain an attorney to file a complaint about the extreme discriminatory treatment she was experiencing at the workplace, and to resolve the problem in an amicable manner, ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC. placed PLAINTIFF on leave in preparation for her wrongful termination.

**PLAINTIFF is terminated by** *ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC.*

22

144. On November 14, 2022, Def. ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC. terminated PLAINTIFF "...*due to your inability to meet company standards.*" (See Exhibit 18)

145. However, Defendants' explanation in their current motion to dismiss asserts that in fact PLAINTIFF was terminated "*because Arteaga filed a third complaint regarding Plaintiff's misconduct, and she refused to cooperate with the investigation*" (See Defendant Memorandum of Law page 22 First ¶.)

146. As asserted above, the complaints made by Def. ARTEAGA against PLAINTIFF were all totally false and moreover, at no point did PLAINTIFF "*refuse to cooperate with the investigation*".

147. As stated above, PLAINTIFF did cooperate with "the investigation" when she first spoke by phone with Def. EUGENE. It was only after Def. EUGENE suggested to PLAINTIFF that she may want to proceed with her Attorney present, that PLAINTIFF in fact chose to end the interview and return at a later date with her Attorney.

148. When Plaintiff, through her Counsel, communicated to Defendants ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC. that she was willing to continue her interview with her attorney present, she was told that said arrangements would not be permitted. Thereafter, PLAINTIFF would not appear without her attorney.

149. Clearly the explanation propounded in Defendants' Memorandum of Law is nothing more than a futile attempt by Defendants to conceal the illegal and discriminatory reason for terminating PLAINTIFF.

## FIRST CAUSE OF ACTION

### FOR HOSTILE WORK ENVIRONMENT DISCRIMINATION BASED ON RACE, AGE AND GENDER ORIENTATION UNDER NEW YORK CITY HUMAN RIGHTS LAW §8-101 AND NEW YORK STATE HUMAN RIGHTS LAW §290 et Seq

150. PLAINTIFF reiterates and incorporates the allegations of paragraphs 1 through 149 above with the same effect as if set forth fully herein.

151. PLAINTIFF as a white Cis-gendered, heterosexual female over 40 years of age is a member of a protected class under the U.S. Equal Employment Opportunity Commission.

152. PLAINTIFF was clearly qualified to hold her position as Manager of the Frederic Malle Editions de Parfums boutiques store as indicated by her performance evaluations (See Exhibit 15)

153. As described in detail above, PLAINTIFF was clearly treated differently than other employees, i.e. instructed to adhere to certain rules when addressing Def. ARTEAGA such as not allowing her to compliment ARTEAGA and to address him with certain pronouns and prohibiting PLAINTIFF from enforcing companywide rules regarding attire and nail polish use. None of those rules were implemented companywide, but rather specifically targeted PLAINTIFF and her ability to supervise Def. ARTEAGA.

154. As clearly established above, but for PLAINTIFF's race, age and sexual orientation ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC. would not have trampled on PLAINTIFF's legally protected rights.

155. The standard for establishing a hostile work environment under New York City Human Rights Law and New York State HRL is essentially the same in that PLAINTIFF must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive - that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the PLAINTIFF subjectively perceived

as hostile or abusive; and (3) creates such an environment because of the PLAINTIFF's protected characteristic, to wit her race, age and gender identity.

156. Here, PLAINTIFF, on account of Def. ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC. and its high level supervisors including but not limited to the individually named Defendants JACOBS, MILLER and EUGENE's efforts to appease and capitalize on the racially, youth-oriented and gender-identity movement as detailed above, created and allowed to exist, a hostile work environment which was clearly objectively severe, which PLAINTIFF obviously perceived as severely hostile and abusive and therefore discriminated against PLAINTIFF, a white, cisgender, heterosexual 70 year old female by singling her out by imposing upon her, rules, protocols and behavior which were not companywide, but rather specifically applied to and targeted at PLAINTIFF.

157. That Def. ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC. through its high level employees, Defendants JACOBS, MILLER and EUGENE, in order to both maximize profits from the newly adopted inclusivity protocols and to quash any potential boycotts and protests, willfully undermined PLAINTIFF's authority to write up or in any way discipline Def. ARTEAGA, thereby humiliating, harassing and embarrassing PLAINTIFF in front of her subordinates including Def. ARTEAGA and Trujillo. Even with the well documented misconduct of Def. ARTEAGA, i.e. his repeated lateness, his flagrant violations of dress code (wrinkled shirts and use of nail polish) ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC. through its high level employees, Defendants JACOBS, MILLER and EUGENE refused to enforce the company wide rules as to DEF. ARTEAGA but did not hesitate to arbitrarily write up and discipline PLAINTIFF solely for discriminatory reasons.

158. That Def. ELC BEAUTY LLC and Defendant ESTÉE LAUDER COMPANIES, INC.

through its high level employees, Defendants JACOBS, MILLER and EUGENE,

discriminated against PLAINTIFF based on her race, gender orientation and age by

failing to adhere to existing corporate rules and etiquette as required and improperly

reprimanded PLAINTIFF when she attempted to properly supervise and discipline her

subordinate, Def. ARTEAGA, who is a male Hispanic, who also identified strongly with

BLM and LGBTQ community causes.

159. As a result of def. ELC BEAUTY LLC's and Defendant ESTÉE LAUDER

COMPANIES, INC. corporate driven interests in profiting from its now wider net of

social inclusivity, including but not limited to its newly focused overlapping

intersectional youth-oriented and gender-identity marketing opportunities,  it permitted a

hostile work environment to envelope PLAINTIFF's employment by enabling the

continued campaign to humiliate PLAINTIFF with diminished status as a supervisor,

false accusations of misconduct and finally forcing her to retain counsel in an effort to

sever her employment with def. ELC BEAUTY LLC and Defendant ESTÉE LAUDER

COMPANIES, INC.

160. That the subsequent conduct and behavior of the named defendants supervisors JACOBS,

MILLER and EUGENE as set forth by PLAINTIFF in her timeline above, clearly

demonstrate that she both subjectively perceived a hostile work environment and that

such an environment was indeed, at the outset, an objective product of reverse racial,

youth-oriented and gender-identity discrimination against her as a result of her attempted

supervisory actions against Def. ARTEAGA as described above.  Said reverse racial,

youth-oriented and gender-identity policies applied to  PLAINTIFF and sustained and

operationalized by the defendants over the balance of PLAINTIFF employment due to

the newly adopted protocols of social inclusivity resulted in invidious and unlawful discrimination of an ambitious qualified white, cisgender, heterosexual, 70 year old woman, PLAINTIFF.

161. That Defendants' JACOBS, MILLER and EUGENE negative references and false disciplinary write ups against PLAINTIFF were motivated by discriminatory animus and corporate institutional bias and were otherwise retaliatory in nature.

162. That from September 2021 (when Def. ARTEAGA was hired) until PLAINTIFF'S termination on November 14, 2022, PLAINTIFF had been systematically and consistently subjected to discrimination in her employment because of her race, gender-identity and age.

163. That Def. ELC BEAUTY LLC. and Defendant ESTÉE LAUDER COMPANIES. INC., choosing profits over people implemented newly adopted social inclusivity protocols in a haphazard and selective manner inconsistent with and against PLAINTIFF's employment and human rights.

164. That Defendants ELC BEAUTY LLC., ESTÉE LAUDER COMPANIES. INC. JACOBS, MILLER and EUGENE failed to implement newly adopted social inclusivity protocols in a uniform and consistent manner in conformity with applicable employment and human rights laws and thereby failed to  promote the very diversity and inclusive values they had sought to implement and thus further both actively and passively encouraged reverse racial, youth-oriented and gender-identity discrimination against white, cisgender, heterosexual, aged employees and in particular PLAINTIFF, who became a victim of said defendants' selective and systemic discrimination, hostile work environment, harassment, retaliation and wrongful termination, among other NYSHRL and NYCHRL violations.

165. That Defendant ARTEAGA discriminated against PLAINTIFF and created a hostile work environment, by making false allegations against PLAINTIFF as described above as well as leaving a copy of the book entitled "*How to be an Anti-racist*," (see ¶ 87), wherein the author encourages discrimination by writing that "*The only remedy to past discrimination is present discrimination. The only remedy to present discrimination is future discrimination.*"

166. That Def. ARTEAGA's deliberate acts against PLAINTIFF created a hostile work environment in which PLAINTIFF was forced to endure ridicule, harassment and outright discrimination at the hands of Def. ARTEAGA.

167. That by Def. ARTEAGA's direct personal actions as described above, he aided and abetted the discrimination and retaliation against PLAINTIFF by Defs. ELC BEAUTY LLC, ESTÉE LAUDER COMPANIES, INC. JACOBS, MILLER and EUGENE.

168. That Def. ARTEAGA, through his actions, i.e. accusing PLAINTIFF of being a racist, repeatedly filing false accusations through H.R against PLAINTIFF, encouraged, condoned and approved of the discriminatory actions taken by Defendants Defs. ELC BEAUTY LLC, ESTÉE LAUDER COMPANIES, INC. JACOBS, MILLER and EUGENE.

169. That but for Def. ARTEAGA's racially and gender motivated attacks against PLAINTIFF, Defendants. ELC BEAUTY LLC, ESTÉE LAUDER COMPANIES, INC. JACOBS. MILLER and EUGENE would not have subjected PLAINTIFF to their discriminatory illegal retaliatory actions i.e. false write-ups, singling PLAINTIFF out to adhere to new unwritten rules that were not implemented company wide, all of which were encouraged, condoned and approved by Def. ARTEAGA .

170. That the deliberate acts of the named defendants subjected PLAINTIFF to inferior terms, conditions and privileges of her employment, i.e. being instructed to adhere to certain rules that singled her out, (use of pronouns), being prevented from performing her supervisory responsibilities as to Def. ARTEAGA, being falsely accused of misconduct, because of her membership in a protected category, i.e. white, 70 year old cisgender heterosexual female.

171. That such discrimination caused PLAINTIFF damages in an amount in excess of the jurisdiction of every other court in which this action might be maintained.

   **WHEREFORE** PLAINTIFF demands judgment against the defendants for an amount in excess of the jurisdiction of every other court in which this action might be maintained.

## SECOND CAUSE OF ACTION
### FOR VIOLATIONS OF 42 U.S.C. §1981

172. PLAINTIFF reiterates and incorporates the allegations of paragraphs 1 through 171 above with the same effect as if set forth fully herein.

173. PLAINTIFF as a white Cis-gendered, heterosexual female over 40 years of age is a member of a protected class under the U.S. Equal Employment Opportunity Commission.

174. PLAINTIFF was clearly qualified to hold her position as Manager of the Frederic Malle Editions de Parfums boutiques store as indicated by her performance evaluations (See Exhibit 15)

175. As described in detail above, PLAINTIFF was clearly treated differently than other employees, i.e. instructed to adhere to certain rules when addressing Def. ARTEAGA such as not allowing her to compliment ARTEAGA and to address him with certain pronouns and prohibiting PLAINTIFF from enforcing companywide rules regarding

attire and nail polish use. None of those rules were implemented companywide, but rather specifically targeted PLAINTIFF and her ability to supervise Def. ARTEAGA.

176. As clearly established above, but for PLAINTIFF's race, age and sexual orientation Defs. ELC BEAUTY LLC, ESTÉE LAUDER COMPANIES, INC., JACOBS, MILLER, EUGENE and ARTEAGA, would not have trampled on PLAINTIFF's legally protected rights.

177. Each named Defendant, ELC BEAUTY LLC, ESTÉE LAUDER COMPANIES, INC., JACOBS, MILLER, EUGENE and ARTEAGA racially discriminated against PLAINTIFF, in violation of the rights of PLAINTIFF and the class afforded her by the Civil Rights Act 1866, *42 U.S.C.§ 1981*, as amended by the Civil Rights Act of 1991.

178. By the conduct described above, each Defendant ELC BEAUTY LLC, JACOBS, ESTÉE LAUDER COMPANIES, INC. MILLER, EUGENE and ARTEAGA intentionally deprived PLAINTIFF, a White female, of the same rights as are enjoyed by Black citizens to the creation, performance, enjoyment, and all benefits and privileges, of her contractual employment relationship with Defendant ELC BEAUTY LLC and ESTÉE LAUDER COMPANIES, INC. in violation of *42 U.S.C. § 1981*.

179. ELC BEAUTY LLC and ESTÉE LAUDER COMPANIES, INC. discriminated against PLAINTIFF as described above, including but not limited to privileging racially discriminating conduct against her, harassing her, subjecting her and actively enabling a hostile work environment, and wrongfully terminating her.

180. As a direct and proximate result of Defendants ELC BEAUTY LLC, ESTÉE LAUDER COMPANIES, INC., JACOBS, MILLER, EUGENE and ARTEAGA unlawful racially discriminatory conduct in violation of Section 1981, PLAINTIFF has suffered and continues to suffer severe mental anguish and emotional distress, including, but not

limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

181. That but for PLAINTIFF's race and sexual orientation, PLAINTIFF would not have suffered the loss of her legally protected rights.

182. That all of the described adverse actions taken by the named defendants against PLAINTIFF occurred under circumstances giving rise to an inference of discrimination against PLAINTIFF.

183. Defendants' unlawful racially discriminatory conduct constitutes a willful and wanton violation of Section 1981, was outrageous and malicious, was intended to injure PLAINTIFF, and was done with conscious disregard of PLAINTIFF's civil rights, entitling PLAINTIFF to an award of punitive damages.

PLAINTIFF requests the Court award her the relief prayed for below.

**WHEREFORE**, the PLAINTIFF demands judgment against each Defendant for all compensatory, emotional, psychological and punitive damages, lost compensation, front pay, back pay, liquidated damage, injunctive relief, and any other damages permitted by law pursuant to the above referenced cause of action. It is respectfully requested that the Court grant the PLAINTIFFs any other relief to which she is entitled, including but not limited to:

1. Awarding reasonable attorneys' fees and the costs and disbursements of this action;

2. Granting such other and further relief that to the Court deems just and proper.

### THIRD CAUSE OF ACTION

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### AS AGAINST DEFENDANTS LUSINE JACOBS, NOE ARTEAGA and ANGELINA MILLER and JENNE EUGENE

184. PLAINTIFF reiterates and incorporates the allegations of paragraphs 1 through 183 above with the same effect as if set forth fully herein.

185. Defendants JACOBS, MILLER, EUGENE and ARTEAGA had a duty to promote an employment atmosphere that preserved employees and mental safety including PLAINTIFF. By failing to follow ELC BEAUTY LLC's rules and protocols JACOBS, MILLER, EUGENE and ARTEAGA created a work environment where PLAINTIFF's mental and physical well-being was endangered.

186. In committing the acts described above, defendants JACOBS, MILLER, EUGENE and ARTEAGA acted negligently and/or recklessly in deliberate disregard of the high degree of probability of the emotional distress that PLAINTIFF would suffer.

187. The conduct of defendants JACOBS, MILLER, EUGENE and ARTEAGA was so outrageous and extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

188. At all relevant times Defendants JACOBS, MILLER, EUGENE and ARTEAGA were employees or agents of def. ELC BEAUTY LLC, acting within the scope of their employment or agency. As such, def. ELC BEAUTY LLC, is vicariously liable for the torts committed by Defendants JACOBS, MILLER, EUGENE and ARTEAGA under the doctrine of respondeat superior.

189. In addition, def. ELC BEAUTY LLC, is directly liable based on its own reckless, extreme, and outrageous conduct by allowing its employees JACOBS, MILLER, EUGENE and ARTEAGA to continually discriminate against PLAINTIFF based on her race, gender-identity and age, retaliate against PLAINTIFF and harass PLAINTIFF. Said misconduct was so shocking and outrageous that it exceeds the reasonable bounds of

decency as measured by what the average member of the community would tolerate and demonstrates an utter disregard by them of the consequences that would follow.

190. ELC BEAUTY LLC, knew or should have known that the foregoing negligent, reckless, extreme, and outrageous conduct by Defendants JACOBS, MILLER, EUGENE and ARTEAGA would inflict severe emotional and psychological distress, including personal physical injury, on others, and PLAINTIFF did in fact suffer severe emotional and psychological distress and personal physical injury as a result, including severe mental anguish, humiliation and emotional and physical distress.

191. ELC BEAUTY LLC's conduct was intentional and outrageous as it pertains to the oversight, knowledge and/or acquiescence of the reverse racial, youth-oriented, gender-identity discrimination of PLAINTIFF at the hands of defendants JACOBS, MILLER, EUGENE and ARTEAGA

192. As a direct and proximate result of the intentional, and outrageous actions of all Defendants, PLAINTIFF suffered and will continue to suffer physically, emotionally, and otherwise.

**WHEREFORE**, PLAINTIFF demand judgment against defendants ELC BEAUTY LLC, LUSINE JACOBS, NOE ARTEAGA, ANGELINA MILLER and JENNE EUGENE for damages in an amount sufficient to compensate her for her compensatory damages, for both physical and emotional pain and suffering, for punitive damage, for costs of suit, attorney fees and for such other relief as the Court finds equitable and just.

### FOURTH CAUSE OF ACTION
### NEGLIGENT HIRING/RETENTION AND
### SUPERVISION AS AGAINST DEF. ELC BEAUTY LLC

193. PLAINTIFF reiterates and incorporates the allegations of paragraphs 1 through 192
     above with the same effect as if set forth fully herein.

194. The defendant, ELC BEAUTY LLC, was negligent, careless, and reckless in the
     supervision, hiring and retention of its employees, including all individually named
     defendants, of hiring employees ill-equipped to perform their respective jobs without
     violating other employees' civil rights including PLAINTIFF's. In allowing its
     employees, including all the individually named defendants to create a hostile work
     environment and in the negligent, careless and reckless manner in which def. ELC
     BEAUTY LLC, hired, trained, supervised, controlled, managed, maintained and retained
     its employees, including all the individually named defendants, resulting in the severe
     and serious injury of PLAINTIFF.

195. PLAINTIFF and Defendants JACOBS, MILLER, EUGENE and ARTEAGA during the
     time periods in question, were all employees of Defendant ELC BEAUTY LLC.

196. Def. ELC BEAUTY LLC, knew or should have known Defendants JACOBS, MILLER,
     EUGENE's propensity to behave in the manner which they did towards PLAINTIFF i.e.
     falsely accuse her of misconduct, subjecting her to arbitrary rules of conduct (prohibiting
     her from complimenting ARTEAGA and ordering her to only use certain pronouns when
     addressing ARTEAGA).

197. All of the acts against PLAINTIFF taken by Def. JACOBS, MILLER and EUGENE were
     committed during work hours and on Def. ELC BEAUTY LLC, premises (the boutique
     store in Greenwich Village, NYC)

198. Def. ELC BEAUTY LLC, knew or should have known Def. ARTEAGA's propensity to
     behave in the manner in which he behaved towards PLAINTIFF. Def. ARTEAGA,
     falsely accused PLAINTIFF of being racist (left book entitled "How to be an Anti-

34

Racist" on PLAINTIFF's desk. Def. ARTEAGA complained to HR regarding

PLAINTIFF's compliments and her calling him by certain pronouns.

199. All of the acts against PLAINTIFF taken by Def. ARTEAGA were committed during

work hours and on Def. ELC BEAUTY LLC, premises (the boutique store in Greenwich

Village, NYC)

200. Notwithstanding PLAINTIFF's repeated reports of misconduct to HR against Def.

ARTEAGA, (including but not limited to his excessive lateness, his continued violations

of company rules re: dress code, nail polish use, disruptive behavior in the store) Def.

ELC BEAUTY LLC

201. That at all times herein above mentioned, defendant ELC BEAUTY LLC by its agents,

servants and/or employees carelessly, negligently, and recklessly hired Defs. JACOBS,

MILLER, EUGENE and ARTEAGA

202. That at all times herein above mentioned, defendant ELC BEAUTY LLC by its agents,

servants and/or employees carelessly, negligently, and recklessly trained its employees

including Defs. JACOBS, MILLER, EUGENE and ARTEAGA.

203. That at all times herein above mentioned, defendant ELC BEAUTY LLC by its agents,

servants and/or employees, failed to investigate prospective employees including Defs.

JACOBS, MILLER, EUGENE and ARTEAGA which would have alerted a reasonably

prudent person to investigate said prospective employees.

204. That at all times herein above mentioned, defendants ELC BEAUTY LLC by its agents,

servants and/or employees carelessly, negligently, and recklessly supervised, controlled,

managed, maintained, and inspected the activities of its employees including Defs.

JACOBS, MILLER, EUGENE and ARTEAGA.

205. That at all times herein above mentioned, defendant ELC BEAUTY LLC. by its agents, servants and/or employees caused. permitted and allowed its employees including Defs. JACOBS, MILLER, EUGENE and ARTEAGA to act in an unprofessional, negligent and/or deliberate manner in carrying out their duties and/or responsibilities.

206. That at all times herein above mentioned, defendant ELC BEAUTY LLC. by its agents, servants and/or employees including Defs. JACOBS, MILLER, EUGENE and ARTEAGA, carelessly, negligently and recklessly retained in its employ, employees clearly unfit for the position who acted in an unprofessional, negligent and/or deliberate manner in carrying out their official duties and/or responsibilities prior to and including on the dates complained of herein.

207. That the occurrence and damages sustained by PLAINTIFF, were caused solely by, and as a result of the malicious, reckless negligent and/or intentional conduct of defendant ELC BEAUTY LLC., its agents, servants and/or employees as set forth above, without any fault on the part of PLAINTIFF contributing thereto, specifically, the negligent and reckless manner in which said defendant ELC BEAUTY LLC. hired, trained, supervised, controlled, managed, maintained, inspected and retained its employees, including Defs. JACOBS, MILLER, EUGENE and ARTEAGA.

208. As a direct and proximate result of the negligent, and outrageous actions of Def. ELC BEAUTY LLC, PLAINTIFF suffered and will continue to suffer physically, emotionally, and otherwise.

**WHEREFORE**, PLAINTIFF demand judgment against defendants ELC BEAUTY LLC, LUSINE JACOBS, NOE ARTEAGA, ANGELINA MILLER and JENNE EUGENE for damages in an amount sufficient to compensate her for her compensatory damages, for

both physical and emotional pain and suffering, for punitive damage, for costs of suit,

attorney fees and for such other relief as the Court finds equitable and just.

## FIFTH CAUSE OF ACTION

## VIOLATION OF THE FEDERAL FAIR LABOR STANDARDS ACT OF 1938 (29 U.S. CODE § 206 – 2016)(FLSA), THE NEW YORK LABOR LAW  (ARTICLE 19, NYLL § 650 ET AL.)(NYLL)

209. PLAINTIFF reiterates and incorporates the allegations of paragraphs 1 through 208

above with the same effect as if set forth fully herein.

210. At all times herein, PLAINTIFF was employed by Def. ELC BEAUTY LLC and ESTÉE

LAUDER COMPANIES, INC..

211. During her 3 ½ years of employment with Def. ELC BEAUTY LLC., and ESTÉE

LAUDER COMPANIES, INC.  PLAINTIFF worked forty (40) hours per week.

However, she would regularly arrive well before her start time to perform various work

tasks before the store opened to the public. PLAINTIFF was not permitted to clock in

before her scheduled start time. Upon information and belief, ELC BEAUTY LLC was

aware that PLAINTIFF was actually in the store preparing to open for the day because

PLAINTIFF would be required to turn off the alarm upon arrival thus notifying ELC

BEAUTY LLC that she was in the store.

212. Defendants ELC BEAUTY LLC and ESTÉE LAUDER COMPANIES, INC., were aware

that PLAINTIFF was repeatedly, over a period of several years, arriving before her

official start time at the Greenwich Village store and working, while she was not allowed

to clock in. ELC BEAUTY LLC knowingly, and in violation of Federal and State Law,

refused to compensate PLAINTIFF at the overtime rate of time and a half as required by

the Federal and State statutes.

37

213. Upon information and belief, over her 3 ½ years of employment with Defendants ELC BEAUTY LLC and ESTÉE LAUDER COMPANIES, INC., PLAINTIFF worked approximately 1000 hours of overtime without received proper compensation.

**WHEREFORE**, PLAINTIFF demand judgment against defendant ELC BEAUTY LLC, and ESTÉE LAUDER COMPANIES. INC., for damages in an amount sufficient to compensate her for her compensatory damages, for both physical and emotional pain and suffering, for punitive damage, for costs of suit, attorney fees and for such other relief as the Court finds equitable and just.

## SIXTH CAUSE OF ACTION
### RETALIATION IN VIOLATION OF 42 U.S.C. §1981

214. PLAINTIFF reiterates and incorporates the allegations of paragraphs 1 through 213 above with the same effect as if set forth fully herein.

215. Defendants ELC BEAUTY LLC and ELC BEAUTY LLC and ESTÉE LAUDER COMPANIES, INC., have violated §1981 by subjecting PLAINTIFF to retaliation for her protected activity, i.e. filing complaints and oppositions to the Defs. JACOBS, MILLER, EUGENE and ARTEAGA's discriminatory treatment on the basis of race and sexual orientation, by, inter alia, terminating PLAINTIFF's employment with the Companies.

216. PLAINTIFF was asserting her protected activity of complaining to Def. ELC BEAUTY LLC, of the discriminatory manner, based on her race, sexual orientation and age, by which all named Defendants had treated her since the hiring of Def. ARTEAGA.

217. That but for PLAINTIFF's protected activity as described above, Defendant ELC BEAUTY LLC, would not have retaliated against her in violation of Sect. 1981.

218. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of § 1981, PLAINTIFF has suffered and continues to suffer monetary and/or economic

38

damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

219. As a direct and proximate result of ELC BEAUTY LLC unlawful retaliatory conduct in violation of § 1981, PLAINTIFF has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

220. ELC BEAUTY LLCs ELC BEAUTY LLC and ESTÉE LAUDER COMPANIES, INC., unlawful retaliatory conduct constitutes a willful and wanton violation of §1981, was outrageous and malicious, was intended to injure PLAINTIFF, and was done with conscious disregard of PLAINTIFF's civil rights, entitling PLAINTIFF to an award of punitive damages.

WHEREFORE, PLAINTIFF demand judgment against all defendants, for damages in an amount sufficient to compensate her for her compensatory damages, for both physical and emotional pain and suffering, for punitive damage, for costs of suit, attorney fees and for such other relief as the Court finds equitable and just.

Dated: New York, NY
    April 5, 2024

Yours, etc.

Hugo Ortega
Tanner and Ortega LLP
*Attorney for PLAINTIFF*
299 Broadway – 17th Floor
New York, NY 10007